Rick J. Sutherland (USB #3162)
JACKSON LEWIS, PLLC
222 S. Main Street, #500
Salt Lake City, Utah 84101
Telephone:  (801) 736-3199
Email: Rick.Sutherland@jacksonlewis.com
          Chris.Moon@jacksonlewis.com

Attorneys for Defendants

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF UTAH CENTRAL DIVISION

| | |
|---|---|
| THOMAS E. PEREZ, SECRETARY OF LABOR, UNITED STATES DEPARTMENT OF LABOR,<br><br>          PLAINTIFF,<br><br>v.<br><br>PARAGON CONTRACTORS CORP. AND BRIAN JESSOP, individually,<br><br>          DEFENDANTS. | Case No.  2:06 CV 00700 |

## DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR ORDER TO SHOW CAUSE

# TABLE OF CONTENTS

BACKGROUND……………………………………………………………………..... 1

     2006 Lawsuit and 2007 Consent Judgment……………………………………………..2

ARGUMENT…………………………………………………………………………...3

  A. Paragon Cannot Be Held in either Civil or Criminal Contempt…………………………3

    1. The Secretary of Labor Cannot Satisfy the Heavy Burden of Demonstrating Civil Contempt…………………………………………………………………………3

    2. Because the Secretary of Labor Actually Seeks to Have Paragon Held in Criminal Contempt, He Must Prove all Elements of his Case Beyond a Reasonable Doubt……4

  B. Paragon Was Not an Employer of the Alleged Child Laborers on SUPR……………….. 7

    1. Paragon was not the Direct Employer of the Nut Gleaners…………………………11

    2. Dale Barlow was not Paragon's Employee……………………………………………12

    3. Paragon Cannot be held Liable as a Joint Employer……………………………....13

  C. The Agricultural Child Labor Exemptions Preclude Liability………………………….. 16

    1. All of the Minors at Issue Gathered Nuts Outside of School Hours…………………17

    2. Minors Ages 12-13 Worked with Their Parents……………………………………… 18

    3. Minors Under the Age of 12 Also Were Exempt…………………………………… 19

  D. A Permanent Injunction is Unwarranted……………………………………………19

CONCLUSION……………………………………………………………………..22

Defendants Paragon Contractors Corp. and Brian Jessop (collectively "Paragon"), by and through their undersigned counsel, hereby respectfully request this Court deny the Secretary of Labor's Motion for Order to Show Cause. As set forth herein, Paragon has not failed to abide by the Court's November 29, 2007 Permanent Injunction ("2007 Consent Judgment"). Paragon did not violate the child labor provisions of the Fair Labor Standards Act ("FLSA" or the "Act") in 2012, and has not done so since the 2007 Consent Judgment. The Secretary of Labor ("Secretary") will be unable to prove a violation of the Act during the hearing scheduled to commence on January 25, 2016.

## BACKGROUND

This matter arises out of a nut gathering activity undertaken by various families from the FLDS Church community in Southern Utah during December of 2012. Defendant Paragon Contractors Corporation (Paragon) is exclusively engaged in the construction and building industry. Defendant Brian Jessop is the owner and President of Paragon. Sometime prior to 2012, Paragon was approached to enter into a contract with the owner of the Southern Utah Pecan Ranch (SUPR) in Hurricane, Utah to conduct the main nut harvest for the ranch. Later, Paragon was asked to take on the maintenance of the ranch as well. Because neither agriculture nor nut farming was part of Paragon's core business, it contracted with Dale Barlow to oversee the pecan ranch maintenance and harvest.

The primary nut harvesting process performed by Mr. Barlow under his contract with Paragon was accomplished through a mechanized procedure utilizing specialized equipment owned by SUPR. After completion of this harvesting process, Mr. Barlow informed members of the local FLDS community that they could come onto the farm and gather fallen nuts off of the ground. Since long before Paragon's contract with SUPR began, Mr. Barlow, with the consent of

the ranch owner, allowed families from the nearby FLDS community to come in after the mechanized harvest to glean nuts that had fallen to the ground. Some FLDS families, including parents and children, did so in December of 2012. It is this activity of picking up fallen nuts off the ground that Plaintiff contends constitutes oppressive child labor in violation of the 2007 Consent Judgment and forms the basis for its present motion seeking a finding of contempt.

**2006 Lawsuit and 2007 Consent Judgment**

The 2007 Consent Judgment relied upon by the Secretary to support its request for contempt arose entirely out of Paragon's construction related activities, involving no agricultural undertakings at all. Rather, one of Paragon's employees had brought an underage family member to work with him on a roofing construction project. The Wage and Hour Division of the Department of Labor (DOL) found a sixteen year old boy hauling boards on the construction job. The DOL contended that the work involved a hazardous activity because the boards were associated with roofing operations. In order to avoid a protracted and expensive dispute, and to demonstrate willingness to avoid future issues with child labor laws, Paragon and Mr. Jessop agreed to entry of the 2007 Consent Judgment. Other than this present dispute about the 2012 SUPR pecan gleaning activities, Paragon has not engaged in any actions that have led to allegations of child labor violations.

**ARGUMENT**

**A.    Paragon Cannot Be Held in either Civil or Criminal Contempt.**

**1.    The Secretary of Labor Cannot Satisfy the
Heavy Burden of Demonstrating Civil Contempt.**

The Court's power of civil contempt "must be narrowly confined" and the Court should use "the least possible power adequate to the end proposed." *In re Reed*, 11 B.R. 258, 264-65 (Bankr. D. Utah 1981) (citing *In re Michael*, 326 U.S. 224, 227 (1945)). Sanctions in civil contempt proceedings may be employed "for either or both of two purposes: to coerce the defendant into compliance with the court's order, and to compensate the complainant for losses sustained." *Local 28 of Sheet Metal Workers' Int'l Ass'n v. E.E.O.C.,* 478 U.S. 421, 443 (1986). "In a civil contempt case, the party seeking a citation of contempt bears a heavy burden." *Orbit Irrigation Prods. V. Sunhills Int'l*, 2:10-CV-113 TS, 2014 U.S. Dist. LEXIS 46492, at *9 (D. Utah Apr. 2, 2014) (citation omitted). The party alleging civil contempt must prove it by clear and convincing evidence. *Reliance Inc. Co. v. Mast Constr. Co.*, 84 F.3d 372, 377 (10th Cir. 1996). Clear and convincing evidence is that evidence that "produces in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established, evidence so clear, direct and weighty and convincing as to enable [the factfinder] to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue." *Orbit Irrigation*, 2014 U.S. Dist. LEXIS 46492, at *9-10, citing *Cruzan v. Dir., Mo. Dep't of Health*, 497 U.S. 261, 285 n.11 (1990) (brackets in original) (internal quotation marks and citations omitted).

To establish civil contempt, the Secretary has the initial burden of proving by clear and convincing evidence that: 1) a valid court order existed; 2) that Paragon had knowledge of the order; and 3) that Paragon disobeyed the order. *ClearOne Communications, Inc. v. Bowers*, 651 F.3d 1200, 1210 (10th Cir. 2011). Once the Secretary makes that showing, the burden shifts to

Paragon to show either that it complied with the order or that it could not comply with it. *ClearOne Communications*, 651 F.3d at 1210.

    **2.**    **Because the Secretary of Labor Actually Seeks to Have Paragon Held in Criminal Contempt, He Must Prove all Elements of his Case Beyond a Reasonable Doubt.[1]**

Here, the Secretary cannot meet the "heavy burden" of the civil contempt standard. Moreover, given the relief sought by the Secretary in his Motion, this matter is subject to an even heavier burden because this proceeding should not be reviewed as a civil contempt proceeding. Rather, the Secretary's requested relief seeks to have the Court hold Paragon in criminal contempt.

In civil contempt settings "the contemnor is able to purge the contempt and obtain his release by committing an affirmative act, and thus carries the keys of his prison in his own pocket." *In re Lucre Mgmt. Grp., LLC,* 365 F.3d 874, 876 (10th Cir. 2004). On the other hand, criminal contempt sanctions are "punitive in nature and are imposed to vindicate the authority of the court" and "punish [parties] for their contemptuous conduct." *Local 28 of Sheet Metal Workers' Int'l Ass'n*, 478 U.S. at 443 & 444. When it becomes obvious that "sanctions are not going to compel compliance, [the sanctions] lose their remedial characteristics and take on more of the nature of punishment." *Soobzokov v. CBS, Quadrangle/New York Times Book Co.*, 642 F.2d 28, 31 (2d Cir. 1981).

Here, although the Secretary claims to be seeking civil contempt sanctions, his request for relief seeks to impose sanctions wholly unrelated to the 2007 Consent Judgment and what

---

[1] Paragon recognizes that this Court has instructed the parties—throughout the written arguments and evidentiary hearing—to focus on whether the court should hold Paragon in contempt and to refrain from arguing about what possible relief might be granted. (ECF No. 41). Paragon discusses the Secretary's requested relief only to show that this proceeding is one of criminal and not civil contempt. Thus, the Secretary must prove the elements of its case beyond a reasonable doubt.

may be necessary to coerce Defendants into compliance with that order. Without any basis, the Secretary asks the Court to impose "enhanced compliance terms," enter factual findings and issue an Amended Injunction (ECF No. 30 at 14-17). The overbroad nature of these requests demonstrates that the Secretary is, in fact, seeking criminal contempt sanctions.

The proposed enhanced compliance terms rise to the level of criminal contempt sanctions because they are punitive in nature and do not afford Paragon the opportunity to purge its contempt through affirmative acts. For example, the Secretary's first and fifth enhanced compliance terms seek to require Paragon to "abide by all federal and state laws," thus including those unrelated to the child labor provisions of the FLSA. Absurdly, the Secretary's proposed relief, if adopted by the Court, would enable future contempt proceedings to be initiated against Paragon for various legal issues, such as potential violations of, *inter alia*, tax law, copyright law, and insurance provisions in its construction contracts. Similarly, the third enhanced compliance term that the Secretary requests is also punitive. It requires Paragon to identify an independent monitor with expertise in the FLSA and to permit this monitor to conduct annual compliance audits for a five-year period on not only the FLSA, including its child labor provisions, but also the MSPA and OSHA. The independent monitor would provide the Department of Labor with a statement of compliance on a bi-annual basis during this five-year period. To require Paragon to have a private auditor perform the job with which the Department of Labor is tasked is punitive and unwarranted. The other enhanced compliance terms sought by the Secretary are likewise punitive in nature thus constituting a request for Criminal Contempt.

The Secretary's request for entry of factual findings also indicates an effort to seek relief in the nature of punishment thereby also constituting Criminal Contempt. In reality, these purported factual findings contain many legal conclusions that would lead to imposition of

possible criminal convictions and civil money penalties against Defendants without the benefit of the constitutionally protected right to jury trial on these issues. This requested relief also seeks to establish legally binding findings and conclusions on persons who are not even parties to the present proceeding.

The request for an Amended Injunction also surpasses the purpose of civil contempt proceedings which is to compel compliance with the Court's order. This request clearly crosses the line into criminal contempt as it seeks affirmative relief beyond what is appropriate in civil contempt proceedings. As is discussed below, it also is inappropriate in any event.

In sum, the Secretary seeks to have this Court hold Paragon in not merely civil contempt, but rather criminal contempt. When criminal contempt sanctions are possible, due process and federal law mandate that "criminal penalties may not be imposed on someone who has not been afforded the protections that the Constitution requires of such criminal proceedings." *Law v. Nat'l Collegiate Athletic Ass'n*, 134 F.3d 1438, 1442 (10th Cir. 1998).  Those Constitutional protections include:

> [D]efendants in criminal contempt proceedings must be presumed innocent, proved guilty beyond a reasonable doubt, and accorded the right to refuse to testify against themselves; must be advised of charges, have a reasonable opportunity to respond to them, and be permitted the assistance of counsel and the right to call witnesses; must be given a public trial before an unbiased judge; and must be afforded a jury trial for serious contempts.

*Id.* at 1443-44 (quoting *Young v. United States ex rel. Vuitton et Fils S.A.,* 481 U.S. 787, 798-99 (1987)). In line with the Tenth Circuit's express direction, Paragon is entitled to Constitutional protections during this proceeding such as the presumption of innocence and that any violations of the 2007 Consent Judgment must be proved beyond a reasonable doubt, including at the evidentiary hearing scheduled to begin on January 25, 2016.

**B.      Paragon Was Not an Employer of the Alleged Child Laborers on SUPR.**

In order for the FLSA's provisions to apply to a worker, that individual must be an "employee" of the employer, meaning that an employment relationship must exist between the worker and the employer. The question of who is an employee under federal law is not new to the Courts. While many of the reported cases deal with different federal statutes, when addressing the question of who is an employee under these laws, the analysis remains the same. The Tenth Circuit has instructed:

> The statutory definition of employee under each of these Acts is virtually identical, and circular in its description. Title VII defines employee as "an individual employed by an employer." It defines employer as "a person engaged in an industry affecting commerce who has fifteen or more employees." 42 U.S.C. Sec. 2000e(b). The ADEA definition is identical except that it requires an employer to employ twenty or more employees. See 29 U.S.C. Sec. 630(b). The definition of employer under the FLSA is equally circular: "'Employer' includes any person acting directly or indirectly in the interest of an employer in relation to an employee." 29 U.S.C. Sec. 203(d). 29 U.S.C. Sec. 203(a); 29 U.S.C. Sec. 630(a); 42 U.S.C. Sec. 2000e(a).
>
> All parties acknowledge that nothing in the legislative history of these Acts explicitly addresses the definition of employee. In general, cases construing definitions of one of the Acts are to be viewed as persuasive authority when interpreting the others. See *Lorillard v. Pons*, 434 U.S. 575, 98 S. Ct. 866, 55 L.Ed.2d 40 (1978); *Hyland v. New Haven Radiology Assocs.*, 794 F.2d 793 (2nd Cir.1986).

*Wheeler v. Hurdman*, 825 F.2d 257, 277 (10th Cir. 1987).

The U.S. Supreme Court has consistently begun its analysis of who is an employee under federal statutes containing no clear direction on the issue by applying common law master-servant rules and then evaluating all additional relevant factors. In deciding the question, the Court has looked primarily to the element of control and then considered other aspects of the relationship being reviewed.

> We have often been asked to construe the meaning of "employee" where the statute containing the term does not helpfully define it. . . . In the past, when

Congress has used the term "employee" without defining it, we have concluded that Congress intended to describe the conventional master-servant relationship as understood by common law agency doctrine. See, e.g., *Kelley v. Southern Pacific Co.*, 419 U.S. 318, 322-323 (1974); *Baker v. Texas & Pacific R. Co.*, 359 U.S. 227, 228 (1959) (per curiam); *Robinson v. Baltimore & Ohio R. Co.*, 237 U.S. 84, 94 (1915). . . .

In determining whether a hired party is an employee under the general common law of agency, we consider the hiring party's right to control the manner and means by which the product is accomplished. Among the other factors relevant to this inquiry are the skill required; the source of the instrumentalities and tools; the location of the work; the duration of the relationship between the parties; whether the hiring party has the right to assign additional projects to the hired party; the extent of the hired party's discretion over when and how long to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; whether the hiring party is in business; the provision of employee benefits; and the tax treatment of the hired party.

*Nationwide Mutual Insurance Co. v. Darden*, 503 U.S. 318, 323 (1992). This same approach was

reconfirmed by the Supreme Court eleven years later in *Clackamas v. Gastroenterology Assocs.*

*PC*, 538 U.S. 440, 444 (2003):

We have often been asked to construe the meaning of 'employee' where the statute containing the term does not helpfully define it. *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 322 (1992). The definition of the term in the ADA simply states that an "employee" is "an individual employed by an employer." 42U.S.C. § 12111(4). That surely qualifies as a mere "nominal definition" that is "completely circular and explains nothing." *Darden*, 503 U.S., at 323. As we explained in *Darden*, our cases construing similar language give us guidance on how best to fill the gap in the statutory text.

In *Darden* we were faced with the question whether an insurance salesman was an independent contractor or an "employee" covered by the Employee Retirement Income Security Act of 1974 (ERISA). Because ERISAs definition of "employee" was "completely circular," 503 U.S., at 323, we followed the same general approach that we had previously used in deciding whether a sculptor was an "employee" within the meaning of the Copyright Act of 1976, see *Community for Creative Non-Violence v. Reid*, 490 U.S. 730 (1989), and we adopted a common-law test for determining who qualifies as an "employee" under ERISA. Quoting *Reid*, 490 U.S., at 739-740, we explained that "'when Congress has used the term "employee" without defining it, we have concluded that Congress intended to describe the conventional master-servant relationship as understood by common-law agency doctrine.'" *Darden*, 503 U.S., at 322-323. As *Darden*

8

reminds us, congressional silence often reflects an expectation that courts will look to the common law to fill gaps in statutory text, particularly when an undefined term has a settled meaning at common law.

In *Shellito v. Commissioner of I.R.S.*, the Court, after citing *Clackamas*, described the

approach to be taken:

> The touchstone is whether the person from whom the services are performed has the right to direct and control the means and manner in which the work shall be done and the result to be accomplished. However, the common law test for describing the conventional master-servant relationship contains no shorthand formula or magic phrase that can be applied to find the answer. All of the incidents of the relationship must be assessed and weighed with no one factor being decisive.
> [T]he factors should concentrate on such things as the right of control, ownership or investment in the business and its assets, risk and reward, financial control, the parties' intent, including the existence of a written employment agreement, work history, nature extent and documentation of work performed, tax and other formalities relating to worker status and similar factors.

437 Fed. Appx. 665, 676 (10th Cir. 2011).

This methodology has been described by several courts as the "hybrid test" because it

begins with the control element critical to the common law master-servant approach and then

combines all other relevant factors included in a broad economic realities test to arrive at a

conclusion. This Court in *Lambertsen v. Utah Dep't of Corr.*, held that the hybrid test was

controlling in situations such as are involved here:

> The hybrid test, which is most often applied to actions under Title VII, is a combination of the economic realities test and the common law right to control test.... Although the hybrid test looks at the economic realities of the situation, the focus of the inquiry is the employer's right to control the "means and manner" of the worker's performance. The court's view is that the hybrid test is most appropriate for the circumstances presented here.

922 F. Supp. 533, 537 (D. Utah 1995), affirmed, 79 F.3d 1024 (10th Cir. 1996). In affirming this

Court's decision to apply the hybrid test in *Lambertsen*, the Tenth Circuit approved the approach

and identified a number of additional factors that should be considered beyond the central

common law question of control:

> Under the hybrid test, the main focus of the court's inquiry is the employer's right
> to control the "means and manner" of the worker's performance. However, the
> hybrid test also looks at other factors, including: (1) the kind of occupation at
> issue, with reference to whether the work usually is done under the direction of a
> supervisor or is done by a specialist without supervision; (2) the skill required in
> the particular occupation; (3) whether the employer or the employee furnishes the
> equipment used and the place of work; (4) the length of time the individual has
> worked; (5) the method of payment, whether by time or by job; (6) the manner in
> which the work relationship is terminated; (7) whether annual leave is afforded;
> (8) whether the work is an integral part of the business of the employer; (9)
> whether the worker accumulates retirement benefits; (10) whether the employer
> pays social security taxes; and (11) the intention of the parties. No single factor is
> conclusive. Rather, the courts are to look at the totality of circumstances
> surrounding the working relationship between the parties.

*Lambertsen v. Utah Department of Corrections*, 79 F.3d 1024, 1028 (10th Cir. 1996). The hybrid

test was again approvingly applied by this Court in *Xie v University of Utah*, No. 2:04 CV 864

TC, 2006 WL 448857, *3, (D. Utah, Feb. 22, 2006), affirmed, 243 Fed. Appx. 367 (10th Cir.

2007). In *Xie* this Court stated:

> While the 'main focus' of the hybrid test is the extent to which an employer
> controls the means and manner of a worker's performance, the Tenth Circuit has
> identified eleven other factors that should be considered.

This Court then goes on to list the same additional eleven factors contained in the Tenth

Circuit's *Lambertsen* decision and reiterates that "no single factor is conclusive. Rather, the

courts are to look at the totality of the circumstances surrounding the working relationship." *Id.*

Accordingly, the decisions of this Court, the Tenth Circuit Court of Appeals and the United

States Supreme Court make it clear that the question of whether the FLDS family members in

this case were employees of Paragon is governed by looking first to whether the alleged

employer "controls the means and manner of a worker's performance" and then considers "the

totality of the circumstances surrounding the working relationship." *Id.* Application of this

standard here inescapably leads to the conclusion that the FLDS family members are not employees of Paragon.

**1.      Paragon was not the Direct Employer of the Nut Gleaners.**

As is evident from the CNN Video that led to the Secretary's investigation here, the families' gleaning activities were not controlled by anyone, let alone by Paragon. The families were free to choose whether to participate in the nut gathering as well as to determine what time they would devote to gleaning or what effort they would expend if they did show up at SUPR. Paragon certainly did not "control the means and manner of a worker's performance" (*Id.*) in this situation as is required in an employment relationship. Paragon was not involved in inviting the families, providing access to SUPR for them or managing their activities. In short, Paragon exercised no control over them. In fact, gleaning nuts off the ground requires no supervision at all and is not usually done under the direction of a supervisor.

Nor did Paragon have any authority or ability to determine these families' working parameters or to subject them to discipline or discharge. None of the buckets and bags used by the families was provided by Paragon, nor did Paragon furnish any equipment, tools, restroom facilities or other items. The nut gathering did not take place on Paragon's property and was not part of its core business. The activity was of a short duration and likely did not even involve the same individuals each day. There are no customary indicia of an employment relationship such as sick leave, vacation, benefits or tax withholdings, and the parties did not intend for any employment relationship to exist. Rather, the families simply viewed this activity as an opportunity for them to gather the nuts for their own use without having to purchase them.

### 2.      Dale Barlow was not Paragon's Employee.

The Secretary seeks to hold Paragon liable for the actions of Dale Barlow, asserting that he was employed by Paragon to maintain the SUPR pecan orchard and that he is an agent of Paragon. (ECF No. 30 at 18). However, applying the legal guidelines stated above establishes that this is not the case.

The practice of allowing families from the nearby FLDS community to glean fallen pecans was implemented by an arrangement between Dale Barlow and SUPR long before Paragon's involvement with the ranch. In connection with this activity, Mr. Barlow deferred to SUPR, not to Paragon, relating to how it was carried out. Mr. Barlow provided all necessary materials and equipment if the families did not bring buckets with them. Paragon furnished none. To the extent the families received any directions, it would have been Mr. Barlow who informed them which areas to glean from. Paragon was neither present nor involved.

Mr. Barlow set his own work hours and determined what work was to be done as well as how to do it. Paragon did not direct or control his efforts. When he needed assistance on the ranch, he requested Paragon to send someone. When individuals from Paragon arrived to assist him, Mr. Barlow directed them rather than the opposite. Mr. Barlow paid his own expenses associated with his work at SUPR and considered himself to be self-employed. He did no other work for Paragon, but did engage in flooring and plumbing work for others independent of Paragon. In addition, Mr. Barlow also facilitated a gleaning arrangement between the FLDS families and another pecan ranch in the area unaffiliated with SUPR and with which Paragon had no relationship of any kind.

All of the equipment used on the ranch was either owned by SUPR or provided by Mr. Barlow. Paragon did not provide equipment. Paragon's core business is construction and it had

no experience with agricultural or nut farm operations or harvesting. Mr. Barlow, on the other hand, had previous general orchard experience as well as specific experience with SUPR. Access to the ranch was obtained either through Mr. Barlow or through SUPR, not through Paragon. All of the activities involved here occurred on SUPR property and not on any property of Paragon.

Both Paragon and Mr. Barlow considered their relationship to be that of an independent contractor. There were no traditional employee benefits involved and Mr. Barlow was paid a lump sum at the conclusion of the season. The agreement was for one year at a time and could be terminated or simply not renewed. Based upon these facts, it is evident that Paragon is not the employer of Mr. Barlow.

### 3. Paragon Cannot be held Liable as a Joint Employer.

Assuming, *arguendo*, that the family members were covered by the FLSA, their direct employer was not Paragon, but Dale Barlow. It is undisputed that Barlow invited the families and arranged for them to have access to SUPR and had done so for many years prior to Paragon's involvement with SUPR. Of course, separate entities that share control over an individual worker may be deemed "joint employers" under the FLSA. *Zachary v. Rescare Oklahoma, Inc.*, 471 F.Supp.2d 1175, 1178 (N.D. Ok. 2006). Although Barlow is not Paragon's employee, the Secretary may attempt to hold Paragon liable under a joint employment theory. Guidance on analyzing the joint employer issue is found in DOL regulations:

> The definition of the term employ includes the joint employment principles applicable under the Fair Labor Standards Act. The term joint employment means a condition in which a single individual stands in the relation of an employee to two or more persons at the same time. A determination of whether the employment is to be considered joint employment depends upon all the facts in the particular case. …
>
> In determining whether or not an employment relationship exists between the agricultural employer/association and the agricultural worker, the ultimate question to be determined is the economic reality—whether the worker is so

economically dependent upon the agricultural employer/association as to be considered its employee.

The factors set forth in paragraphs (h)(5)(iv)(A) through (G) of this section are analytical tools to be used in determining the ultimate question of economic dependency. The consideration of each factor, as well as the determination of the ultimate question of economic dependency, is a qualitative rather than quantitative analysis. The factors are not to be applied as a checklist. No one factor will be dispositive of the ultimate question; nor must a majority or particular combination of factors be found for an employment relationship to exist. ***The analysis as to the existence of an employment relationship is not a strict liability or per se determination under which any agricultural employer/association would be found to be an employer merely by retaining or benefiting from the services of a farm labor contractor.*** The factors set forth in paragraphs (h)(5)(iv)(A) through (G) of this section are illustrative only and are not intended to be exhaustive; other factors may be significant and, if so, should be considered, depending upon the specific circumstances of the relationship among the parties. How the factors are weighed depends upon all of the facts and circumstances. Among the factors to be considered in determining whether or not an employment relationship exists are:

(A)     Whether the agricultural employer/association has the power, either alone or through control of the farm labor contractor to direct, control, or supervise the worker(s) or the work performed (such control may be either direct or indirect, taking into account the nature of the work performed and a reasonable degree of contract performance oversight and coordination with third parties);

(B)     Whether the agricultural employer/association has the power, either alone or in addition to another employer, directly or indirectly, to hire or fire, modify the employment conditions, or determine the pay rates or the methods of wage payment for the worker(s);

(C)     The degree of permanency and duration of the relationship of the parties, in the context of the agricultural activity at issue;

(D)     The extent to which the services rendered by the worker(s) are repetitive, rote tasks requiring skills which are acquired with relatively little training;

(E)     Whether the activities performed by the worker(s) are an integral part of the overall business operation of the agricultural employer/association;

(F)     Whether the work is performed on the agricultural employer/association's premises, rather than on premises owned or controlled by another business entity; and

(G)     Whether the agricultural employer/association undertakes responsibilities in relation to the worker(s) which are commonly performed by employers, such as preparing and/or making payroll records, preparing and/or issuing pay checks, paying FICA taxes, providing workers' compensation insurance, providing field sanitation facilities, housing or transportation, or providing tools and equipment or materials required for the job (taking into account the amount of the investment).

29 CFR 500.20(h)(5) (emphasis added).

Applying these factors to this case leads to the inexorable conclusion that Paragon was not the employer of the minors that gathered nut residue at SUPR. First, Paragon was unaware of the actual individuals who assisted with the nut gleaning and was not involved in inviting, scheduling or managing them. Accordingly, it did not have the power to hire or fire any of the individuals, and could not have supervised or controlled work schedules or conditions of employment. Nor could Paragon have assigned them to perform additional work projects for Paragon.[2] Although none of the family members, including the minors, were paid cash for their services, the FLDS family members did keep half of the nut residue that they collected. Paragon was unaware of this fifty percent arrangement and did not reach agreement with anyone regarding this system of compensation. Accordingly, Paragon did not determine the rate or method of payment. Given that Paragon does not even know the names of every individual who participated in picking up nuts it could not have maintained any employment records. The nut gathering, which occurred only at the end of the mechanical harvesting process, was of a short duration and likely involved different individuals on different occasions. It occurred after Paragon considered its work to be completed. Thus, there was no permanency to the relationship. Paragon provided no field sanitation facilities for the families, and furnished no equipment or

---

[2] Because Paragon's business is construction, most of the individuals who participated in gleaning nuts would not have the requisite skills or experience to perform work for Paragon on its construction projects. Nor does Paragon employ minors in its construction operations.

materials required for the gleaning. The farm where the gathering occurred was not owned by Paragon and none of the activities were performed on Paragon's premises. The collecting of nuts was not part of Paragon's overall business at all, let alone an integral part. In sum, Paragon's lack of involvement in the post-mechanized nut gathering at SUPR conclusively shows that it was not the joint employer of any children who may have worked there.

**C.    The Agricultural Child Labor Exemptions Preclude Liability.**

Even if the Court were to find that Paragon was an "employer" of the children that gathered nuts, Paragon would still not be liable for any FLSA violations because the child labor agricultural exemptions preclude the assessment of back wages and civil monetary penalties. Section 212(c) of the FLSA prohibits the use of "oppressive child labor" in commerce. 29 U.S.C. § 212(c). The Department of Labor's regulations define "oppressive child labor" as "employment of a minor in an occupation for which he does not meet the minimum age standards of the Act, as set forth in §570.2 of this subpart." 29 C.F.R. § 570.1(b). Likewise, the November 2007 Consent Judgment did not prohibit Paragon from engaging in the lawful use of child labor. Rather, the 2007 Consent Judgment prohibited Paragon from employing minors within the meaning of the FLSA "under conditions constituting oppressive labor … and in occupations therein declared to be hazardous." (ECF No. 26).

Section 13(c) of the Act provides for exemptions from the child labor provisions for children engaged in agricultural employment under various circumstances, depending upon their ages. As set forth below, under the FLSA and its regulations, all of the nut gathering children are properly classified as exempt from child labor prohibitions.

### 1.    All of the Minors at Issue Gathered Nuts Outside of School Hours.

Under the Act, minors who are at least 16 years of age may perform any farm job, including during school hours.[3] Thus, there is no violation of this Court's 2007 Consent Judgment with respect to this group. Likewise, minors ages 14-15 may also be employed in agriculture, but the Act provides that such work must be "outside of school hours for the school district where such employee is living while he is so employed." 29 U.S.C. § 213(c); 29 C.F.R. § 570.2(b). The phrase "school hours" is not defined in the Act, but applying local law to the circumstances of this case shows that the nut gathering occurred "outside school hours."

By its terms, the Act specifically looks to local law for purposes of determining when school attendance is required. All of the children at issue were homeschooled and lived in one of two border towns, either Colorado City, Arizona or Hildale, Utah. The laws of both States expressly exclude homeschooled children from regular public school attendance. Arizona law specifically releases from regular public school attendance any child who "is provided with instruction in a homeschool," as well as any child who "is accompanied by a parent or person authorized by a parent." Ariz. Rev. Stat. §15-803. Accordingly, all of the children who might have been from Colorado City, Arizona would qualify as exempt from the regular public school attendance requirement of his or her school district under either or both of these exclusions. Likewise, Utah law, which would apply to those children who lived in Hildale, Utah, also exempts from public school attendance a school-age minor who attends a home school. Utah Code Ann. § 53A-11-102.

---

[3] The FLSA and its regulations prohibit children from working in certain agricultural occupations that are deemed to be hazardous by the Secretary of Labor. There is no allegation here that the activities at issue, simply gathering fallen nuts off of the ground, involved any hazardous work.

Thus, the determination of whether the minors at issue were employed "outside" of school hours depends upon whether their home school was in session at that time, as the "school hours" for homeschooled children are the hours set by the homeschool itself. It is evident that all of the children at the nut gathering activity on SUPR were there outside of required school hours, as they were accompanied by their parents who provided the home schooling and set the hours. Accordingly, all children age 14 and over were legally engaged in the activity of nut gathering at SUPR. No violation of the child labor provisions of the FLSA occurred during those children.[4]

### 2.    Minors Ages 12-13 Worked with Their Parents.

Minors between the ages of 12-13 also may be employed outside of school hours, so long as they have either written parental consent or work on a farm where the minor's parent or person standing in place of the parents is also employed. 29 CFR 570.2(b) Here, all of the children who gathered nuts at SUPR did so alongside parents or relatives standing in place of their parents. Indeed, the CNN news footage that the Secretary references as having spurred its initial investigation clearly shows numerous adults gleaning nuts directly alongside minors. Thus, the presence of children ages 12-13 also met the requirements of the child labor agricultural exemptions and did not violate the FLSA.

---

[4] Defendants are aware that the Secretary's position is that minors may only be employed outside school hours of the public school district in which the minor is living "even if that minor does not attend public school," including if the minor "attends a private or parochial school, is home schooled, or has completed his or her formal education." *See* U.S. Dep't of Labor, Child Labor Requirements In Agricultural Occupations Under the Fair Labor Standards Act (Child Labor Bulletin 102), (Revised June 2007). Such an interpretation, which ignores the regulation's emphasis on local law determining what qualifies as school hours, is plainly erroneous and inconsistent with the regulation. It would be illogical for home schooled children to be banned from working during times that Utah and Arizona law expressly exempt them from attending school. Thus, it would be "undoubtedly inappropriate" to grant deference to the DOL's flawed interpretation of its regulations. *Christopher v. SmithKline Beecham Corp.*, 567 U.S. ___, 132 S. Ct. 2156, 2166 (2012).

###### 3.      Minors Under the Age of 12 Also Were Exempt.

Children under the age of 12 are exempt when they work on a farm where employees are exempt from the minimum wage provisions of the FLSA by virtue of Section 13(a)(6)(A) of the Act. Under that Section, any employer in agriculture who did not utilize more than 500 "man-days" of agricultural labor in any calendar quarter of the preceding calendar year is exempt from the minimum wage and overtime provisions of the FLSA for the current calendar year. 29 U.S.C. § 213(a)(6)(A). A man-day is defined as "any day during which an employee performs any agricultural labor for not less than one hour." 29 U.S.C. § 203(u). The regulations note that "500 man-days is approximately the equivalent of seven employees employed full-time in a calendar quarter." 29 C.F.R. § 780.305(a).

Paragon is alleged to have violated the FLSA's child labor provisions in 2012. Paragon did not, during any quarter of the year 2011, use more than 500 man-days of agricultural labor. Thus, the agricultural exemption applies here and there is no oppressive child labor here that would support a finding that Paragon violated the 2007 Consent Judgment.

### D.      A Permanent Injunction is Unwarranted.

The Secretary also asks the Court to enter an Amended Permanent Injunction against Paragon to enjoin it from violating the FLSA. (ECF 30 at 19-20). An Amended Permanent Injunction is both unnecessary and inappropriate in this case.

As an initial matter, Paragon is already subject to an injunction that "shall remain in effect on a permanent basis" that prohibits it from employing minors under conditions that constitute oppressive child labor. (ECF No. 26). Therefore, an Amended Permanent Injunction would have no practical effect on Paragon's future compliance with the FLSA.

As the Supreme Court has stated, a plaintiff seeking a permanent injunction must demonstrate: 1) he has suffered an irreparable injury; 2) remedies available at law, such as monetary damages, are inadequate to compensate for that injury; 3) considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and 4) the public interest would not be disserved by a permanent injunction. *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006); *see also Waterton Polymer Prods. USA, LLC v. EdiZone, LLC*, 2:12-cv-17 TS, 2015 U.S. Dist. LEXIS 32830, at *18 (D. Utah Mar. 16, 2015).

The Secretary's lengthy delay in seeking injunctive relief militates against this being an appropriate remedy. The Tenth Circuit has held that delay in bringing a motion for emergency relief is strong evidence that there is in fact no irreparable injury. *GTE Corp. v. Williams*, 731 F.2d 676, 678 (10th Cir. 1984) (delay of almost a year before seeking relief "undercuts the sense of urgency" accompanying a request for injunctive relief and "suggests that there is, in fact, no irreparable injury"); *see also Utah Gospel Mission v. Salt Lake City Corp.*, 316 F. Supp. 2d 1201, 1221 (D. Utah 2004) (any unnecessary delay in seeking relief "may be viewed as inconsistent with a claim that plaintiff is suffering great injury"); *Exec. Boat & Yacht Brokerage v. Aramark Sports & Entm't Servs.*, 2:07-cv-69-DAK, 2007 U.S. Dist. LEXIS 16303, at *10-11 (D. Utah Mar. 7, 2007) (Delay of three years prior to seeking injunctive relief weighed against injunction).

Here, the Secretary filed his motion for an order to show cause on September 8, 2015. (ECF No. 30). The motion seeks a permanent injunction based upon conduct alleged to have occurred in or around December 2012. (ECF No. 30 at 3). In spite of the Department of Labor's awareness of the alleged violations for three years, no request for injunctive relief has been filed until 2015. Although the Secretary claims that the DOL's investigation was delayed due to the need for administrative subpoena enforcement actions, that does not explain why the Secretary

20

could not have sought injunctive relief against Paragon while expanding its investigation to seek testimony from FLDS leaders. The Secretary's lengthy delay in seeking such relief demonstrates that no irreparable harm has occurred.

While Section 217 of the FLSA provides that a district court can enjoin violations of the Act, a permanent injunction is not "mandatory under the law." *Shultz v. Mistletoe Express Service, Inc.*, 434 F.2d 1267, 1271 (10th Cir. 1970). Rather, the Secretary, as the movant, bears the burden to show that the injunction is necessary. *Metzler v. IBP, Inc.*, 127 F.3d 959, 963 (10th Cir. 1997). In attempting to fulfill this burden, the Secretary must demonstrate that "there exists some cognizable danger of recurrent violation, something more than the mere possibility which serves to keep the case alive." *Perez v. Stone Castle LLC*, 1:14-CV-66 TS, 2015 U.S. Dist. LEXIS 81147, at *11-12 (D. Utah June 22, 2015), citing *Mitchell v. Hertzke*, 234 F.2d 183, 187 (10th Cir. 1956). As the Tenth Circuit has explained:

> The purpose of an injunction in a case of this kind is to prevent future violations in the public interest, not to punish for past transgressions. Equity will not do a useless or vain thing, and in the absence of some likelihood or probability that the violations will recur, the court is fully justified in refraining from entering an empty decree. … These cases declare the principle that an injunction will not issue merely to punish past violations but only to stop existing violations or to prevent future infractions.

*Mitchell v. Hertzke*, 234 F.2d 183, 186-187 (10th Cir. 1956).

> Courts properly look at many factors in determining whether to grant a prospective injunction, including the employer's previous conduct, its current conduct, and the reliability of its promises of future compliance. When a past violation is found, courts balance that finding against factors indicating a reasonable likelihood that the violation will not recur, such as the employer's intent to comply, extraordinary efforts taken to prevent recurrence, the absence of repetitive violations, and the absence of bad faith.

*IBP, Inc.*, 127 F.3d at 963-64.

21

In the instant matter, the Secretary has not even alleged any unlawful continuing conduct. Thus, a permanent injunction is not only unnecessary to prevent future violations, but would be inappropriate under the circumstances here. Accordingly, even if the Secretary proves a violation in 2012, the absence of any prospective pending violations precludes the issuance of further injunctive relief.

## CONCLUSION

For the foregoing reasons, the Secretary of Labor's motion for an order to show cause should be denied. Paragon respectfully requests that the Court find that it did not violate the FLSA's child labor provisions, and therefore is not in contempt of the Court's prior Consent Judgment.

Respectfully submitted,

DATED this 20th day of  November, 2015.

*s/ Rick J. Sutherland*
Rick J. Sutherland (USB #3162)
M. Christopher Moon (USB #14880)
JACKSON LEWIS PLLC
222 South Main Street, #500
Salt Lake City, UT 84101
(801) 736-3199 - Telephone
Rick.Sutherland@jacksonlewis.com
Chris.Moon@jacksonlewis.com

*ATTORNEYS FOR DEFENDANTS*

## CERTIFICATE OF SERVICE

I hereby certify that on this 20th day of November, 2015, I caused the foregoing **OPPOSITION TO PLAINTIFF'S MOTION FOR ORDER TO SHOW CAUSE** to be served via the Court's ECF electronic filing system, on the following:


John W. Huber, U.S. Attorney
John K. Mangum, Assistant U.S. Attorney
District of Utah
185 S. State St., #300
Salt Lake City, UT 84111-1506


M. Patricia Smith, Solicitor of Labor
James E. Culp, Regional Solicitor
John Rainwater, Associate Regional Solicitor
Karen Bobela, Trial Attorney
Alicia Truman, Trial Attorney
Lydia Tzagoloff, Senior Trial Attorney and Special
Assistant US Attorney
1244 Speer Boulevard, Suite 515
Denver, CO 80204


/s/ Rick J. Sutherland
For Jackson Lewis PLLC


4846-8137-4762, v. 2


23