Kate O'Scannlain, Solicitor of Labor
James E. Culp, Regional Solicitor
John Rainwater, Associate Regional Solicitor
Karen E. Bobela, Trial Attorney, CO #37190 (Pro Hac Vice)
Alicia Truman, Trial Attorney, CO #42235 (Pro Hac Vice)
Lydia Tzagoloff, Wage and Hour Counsel and
  Special Assistant United States Attorney, NY #2631299 (Pro Hac Vice)
1244 Speer Boulevard, Suite 515
Denver, CO  80204
(303) 844-1745
Email: bobela.karen.e@dol.gov; tzagoloff.lydia@dol.gov; truman.alicia.a@dol.gov
Attorneys for Plaintiff

### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF UTAH

| | |
|---|---|
| THOMAS E. PEREZ, SECRETARY OF LABOR, UNITED STATES DEPARTMENT OF LABOR,<br><br>    PLAINTIFF,<br>v.<br><br>PARAGON CONTRACTORS CORP. and BRIAN JESSOP, individually<br><br>    DEFENDANTS. | Civil Action No.  2:06-cv-00700 TC<br><br><br>**PLAINTIFF'S PROPOSED MEMORANDUM DECISION INCLUDING FINDINGS OF FACT AND CONCLUSIONS OF LAW** |

On June 1, 2016, the Court found Defendants in contempt of a 2007 Permanent Injunction prohibiting future violations of the FLSA's child labor provisions. *See* Doc. 99. Just over a year later, Plaintiff filed another show cause motion arguing that Defendant Paragon Contractors Corporation ("Paragon") simply changed its name to Par 2 Contractors, LLC ("Par 2"), and promptly resumed using child labor. Plaintiff alleges that Par 2, as a successor in interest to Paragon, is bound by the 2007 injunction. Defendants deny that Par 2 is a successor to Paragon.

The Court held an evidentiary hearing on February 26-27, 2018. Plaintiff was represented by Karen E. Bobela, attorney for the United States Department of Labor. Defendants were

represented by Rick Sutherland. Par 2, an intervening party, was represented by Jeffrey Matura. The Court heard testimony of witnesses, received into evidence several exhibits and joint stipulations by the parties, and has considered the parties' written arguments. After considering all of the evidence, the Court finds that Par 2, as a successor to Paragon and Brian Jessop, individually, violated the permanent injunction entered by this Court on November 29, 2007.

## FINDINGS OF FACT[1, 2]

1.      The Court entered a Permanent Injunction against Defendants Paragon, Brian Jessop, and James Jessop on November 29, 2007.[3]  Pursuant to the injunction:

> Defendants shall not, contrary to Sections 12(c) and 15(a)(4) of the FLSA, employ, suffer or permit minors to work in commerce or in the production of goods for commerce, or in an enterprise engaged in commerce or in the production of goods for commerce, within the meaning of the FLSA under conditions constituting oppressive child labor as defined in § 3(l) of the FLSA, 29 U.S.C. § 203(l), and in occupations therein declared to be hazardous as defined in the regulations found at 29 C.F.R. Part 570 (Subparts C and E).

2.      The Injunction enjoins and restrains "defendants, their officers, agents, servants, employees, and those persons in active concert or participation with them who receive actual notice of [the injunction]."[4]

3.      On June 1, 2016, following an evidentiary hearing, the Court found Defendants

---

[1] The Court enters these findings of fact based on a preponderance of the evidence. In assessing the credibility of witnesses, the Court has considered: the source and basis of each witness's knowledge; the strength of each witness's memory; each witness's interest, if any, in the outcome of the litigation; the relationship of each witness to either side in the case; and the extent to which each witness's testimony is corroborated or contradicted by other evidence presented at the hearing.

[2] References to the hearing transcript are cited as "Transcript [page:lines]." References to exhibits admitted at the hearing are cited as "Ex. [X]" as numbered at the hearing. References to witness declarations and exhibits attached thereto submitted in advance of trial are cited by their ECF Document Number, page number, and paragraph number where applicable, i.e. "Doc. X, p. X, ¶ X."

[3] Doc. 26.

[4] Doc. 26; Fed. R. Civ. P. 65(d).

Paragon and Brian Jessop in contempt of the 2007 injunction.[5]

4.      The Court entered a Sanctions Order on December 6, 2016, finding:

> Here, shortly after being caught using child labor in the construction industry and agreeing to the entry of the Injunction, Defendants secretly began profiting from child labor once again. Defendants sought to conceal their knowing and willful violation of the Injunction. They told employees to lie about the child labor and even developed signals and strategies for hiding child workers during inspections. They failed to maintain records of work performed on the Ranch, denied the Department access to the Ranch, refused to provide names of employees who worked at the Ranch, refused to respond to subpoenas, and made incredible denials of their involvement with the work at the Ranch.[6]

Additionally, the court found Defendants "not credible," and their testimony "evasive and often . . . contradicted by other witnesses' testimony."[7]

5.      The Court also determined that "Defendants have left the Court with no assurance that they are in compliance with its order or that they will, on their own accord, comply in the future."[8] As a remedy for Defendants' contempt, the Court appointed a special master to monitor Defendants' compliance with the Court's injunction, and ordered Defendants to make an initial payment of $200,000 to the Department of Labor to place into an interest bearing account to serve as a fund to compensate children for their work.[9]

6.      Plaintiff filed another show cause motion on September 25, 2017, alleging that Defendants and Par 2 Contractors, LLC, as successor in interest to Paragon, were again in contempt of the 2007 injunction, as well as the Order Appointing Special Master.[10]

7.      Defendants appealed the Court's Order to the United States Court of Appeals for

---

[5] Doc. 99.
[6] Doc. 109.
[7] Doc. 99, p. 6-7.
[8] Id.
[9] Id. The Order contemplates a one-year claims process for eligible individuals to submit claims for compensatory back wages from the fund. The claims process ended on April 14, 2018. The parties are currently briefing this matter for the Court. See Docs. 109, 136, & 189.
[10] Doc. 138.

the Tenth Circuit. In March 2018, the Tenth Circuit affirmed Judge Campbell's finding of contempt and the compensatory damages contempt sanction, but reversed the appointment of a special master.[11]

8.      In light of the Tenth Circuit's decision, the parties stipulated that the only issue currently before this Court is whether Defendants and Par 2, as a successor in interest to Paragon, violated the 2007 Permanent Injunction.[12]

## Par 2 is a Successor in Interest to Paragon

*There has been a substantial continuity in operations, work force, location, management, working conditions and methods of production between Paragon and Par 2.*

9.      Par 2 is a commercial framing company, as was Paragon.[13]

10.      Par 2 filed Articles of Incorporation with the Utah Secretary of State on December 2, 2013, but it did not begin to operate as a business until August 2014.[14]

11.      While Paragon remains an active company, it has no contracts for work, jobs, or employees.[15] Paragon sold most of its tools and equipment over the last few years.[16] At most, Paragon had "a job or two" that was "still going on" in 2016 somewhere in Louisiana, but Brian Jessop does not remember any details of the job.[17] Paragon had no jobs or contracts for work in 2017.[18]

12.      Brian Jessop testified that he has been downsizing Paragon's operations since 2011 for personal reasons, but his testimony is inconsistent with Paragon's tax records, that he

---

[11] *Acosta v. Paragon et al,* 884 F.3d 1225 (10th Cir. 2018).
[12] Doc. 188.
[13] Transcript 23:14-19.
[14] Ex. 20 (Par 2 did not begin operations until August 2014); Transcript 323:14-21.
[15] Transcript 217:9-16.
[16] Transcript 257:9-19.
[17] Transcript 225:24-226:6.
[18] Transcript 225:21-226:20

read into the record, establishing that Paragon's gross receipts and sales were $5,619,108 in 2010, $6,683.579 in 2011, and $6,088,107 in 2012.[19]

13.     Porter Brothers is a general contractor located in Gilbert, Arizona.[20] Porter Brothers hired Paragon as a subcontractor for various jobs between 2013 and 2015.[21] In May 2015, Porter Brothers received a bid from the same individuals it worked with at Paragon, but under the company name Par 2 Contractors, LLC, and Porter Brothers has worked with Par 2 (and not Paragon) ever since.[22]

14.     Like Paragon, Par 2 does work for large commercial hotels like Hyatt and Marriott, universities, and other large scale commercial projects.[23]

15.     Par 2's annual dollar volume of business was $1,030,998 in 2014, $5,753,562 in 2015, and $8,022,510.87 (YTD at the time of Wage Hour's investigation) in 2016.[24]

16.     Paragon's address is 1065 W. Utah Avenue, Hildale, UT, 84784.[25] Par 2 shared the same address from the time it incorporated up until the summer of 2017.[26]

17.     Paragon's phone number was (435) 874-1310.[27] Par 2 used the same phone number for several years.[28] Jake Barlow claimed that Par 2 eventually got a new phone number

---

[19] Transcript 232:23-233:13, 282:22-283:20, 284:10-286:3.

[20] Doc. 148, p. 1, ¶ 1.

[21] Doc. 148, p. 1, ¶ 2.

[22] Doc. 148, p. 1, ¶ 3; Transcript 62:21-25.

[23] Doc. 148, pgs. 3-28 (Paragon contracts for a dentist office, Marriott Courtyard at Lehi, and Marriott Courtyard Mesa), 33-73 (Par 2 contracts for Marriott Courtyard at Sedona, Marriott Courtyard at Westminster, Home2Suites Glendale, etc.); Doc. 153, p. 5, ¶ 12; Ex. 20.

[24] Doc. 150, p. 2, ¶ 9.

[25] Doc. 148, p. 31.

[26] Transcript 325:4-326:2, 329:7-23; Doc. 151, p. 38; Ex. 16. Par 2 utilized two addresses from the time of its existence until the summer of 2017, i.e. 1065 W. Utah Avenue and 780 North Pinion, but both addresses are for the same building where Paragon operates from as well. Transcript 325:4-326:2, 329:15-23, 340:3-7; Doc. 153, p. 4, ¶ 10.

[27] Transcript 252: 8-253:3.

[28] Doc. 148, p. 33, 42, 50; Transcript 252:14-15, 253:2-3, 254:8-17; Doc 167-3, p. 1.

but he could not recall when and there is no evidence to support his testimony.[29] Don Jessop also could not recall when Par 2 got a separate phone number.[30]

      18.     All of Par 2's upper level employees are former employees or management of Paragon:

<u>Brian Jessop:</u>

      a.     Brian Jessop was the owner of and estimator for Paragon, and he continues to be an estimator for Par 2.[31]

      b.     Brian Jessop is a party to the 2007 Injunction.[32]

      c.     Brian Jessop is also a supervisor for Par 2, as reflected on a Fall Protection Pre-Test that he signed for Kimball Barlow in November 2015 in the capacity of a supervisor for Par 2.[33]

      d.     Par 2's foreman identified Brian Jessop as Par 2's safety coordinator in November 2016.[34]

      e.     When contractors like Porter Brothers sent bid requests to Par 2, they sent the requests to Brian Jessop, and the bids Porter Brothers received from Par 2 had Brian Jessop's name at the bottom of them.[35]

      f.     Brian Jessop communicated with estimators and project managers from

---

[29] Transcript at 299:24-300:7.
[30] Transcript at 340:23-341:5.
[31] Doc. 148, pg. 1, ¶ 2-3.
[32] Doc. 26.
[33] Doc. 151, p. 4-5. Par 2 produced this document to ADOSH Inspector Jeff Wilson to verify that it provided fall protection training to its employee on November 18, 2015, following the citation issued by ADOSH. Doc. 151, p. 3, ¶ 8; Tr. at 104:3-106:11.
[34] Doc. 147, p. 1, ¶ 3; Doc. 147, p. 15.
[35] Transcript 51:14-52:11, 53:12-54:9; Doc. 148, p. 1, ¶ 3.

Porter Brothers – on behalf of Par 2 – to clarify proposals and contracts for work.[36]

g.      On several occasions, Brian Jessop authorized material changes to proposals on behalf of Par 2.[37]

h.      Brian Jessop was also the primary contact person identified on at least one of Par 2's subcontractor agreements with Porter Brothers,[38] on another contractor's (Bonneville Builders) subcontractor list,[39] and on another Par 2 subcontract agreement with Wadman Corporation.[40]

i.      Brian Jessop has been involved with most of Par 2's bids since Par 2 was formed, including making material changes to bids.[41]

j.      Brian Jessop's involvement is not limited to the bidding process; he also oversees the day to day operations of Par 2's work sites through the completion of Par 2's work.[42]

Don Jessop:

a.      Don Jessop is Brian Jessop's brother.[43]

b.      Don Jessop's declaration states he was employed by Paragon until 2004.[44] However, in August 2017, Don Jessop told the U.S. Department of Labor, Wage Hour Division

---

[36] Transcript 53:5-11; 54:10-14; Doc. 148, p. 49 & 65.
[37] Transcript 53:5-54:14, 253:4-13, 255:3-13; Doc. 148, p. 49 & 65.
[38] Transcript 54:15-24; Doc. 148, p. 66.
[39] Doc. 178 (Wage Hour obtained this subcontractor list identifying Brian Jessop as the point of contact for Par 2 in response to investigating a complaint of child labor at a construction site in Springdale, UT. Transcript 185:16-24).
[40] Doc. 167-3, p. 9 (*see* Brian Jessop's Par 2 email address, par2brian@speedmail.com)
[41] Transcript 234:12-235:4, 252:5-7, and 253:4-255:13. The only bid identified by Par 2 that was prepared by anyone other than Brian Jessop is dated December 2017, after Plaintiff's show cause motion was filed alleging that Par 2 is a successor in interest to Paragon. Transcript 391:4-392:6.
[42] Exhs. 7-11.
[43] Doc. 158, p. 2, ¶ 8.
[44] Doc. 167, p. 1, ¶ 3.

("Wage Hour") that he worked for Paragon between 1998 and 2006.[45] At trial, Don Jessop testified that he worked as a foreman for Paragon between 2013 and 2015.[46] Dennis Porter also confirmed that Don Jessop worked as a foreman for Paragon between 2013 and 2015.[47]

       c.     In contrast, Brian Jessop testified that Don Jessop worked for Paragon between 2002 and 2004, but he acknowledged that Don Jessop appears on Paragon's employee list provided to Wage Hour pursuant to a subpoena in 2012.[48]

Jake Barlow:

       a.     Jake Barlow worked for Paragon from at least 2011 to 2014 before he joined Par 2.[49]

       b.     Along with Brian Jessop, Jake Barlow was a primary point of contact for contractors at Paragon.[50]

       c.     Jake Barlow continued to be the point of contact for contractors at Par 2.[51]

       d.     Jake Barlow signed OSHA's Form 300A for Paragon in the capacity of "Office Manager" and "Manager" between 2012 and 2014.[52] He continued to sign OSHA's Form 300A for Par 2 in the same capacity.[53]

       e.     Jake Barlow also did timekeeping, payroll and accounting for Paragon, and he continued to do timekeeping, payroll and accounting for Par 2.[54]

Benjamin Barlow:

---

[45] Ex. 20.
[46] Transcript 350:15-18.
[47] Transcript 62:14-20 and Doc. 148, pg. 1, ¶ 2.
[48] Doc. 158, p. 3, ¶ 12. Transcript 263:16-265:4; Exhs. 12-13.
[49] Transcript 292:24-293:1.
[50] Doc. 148, p. 1, ¶ 2, and p. 29.
[51] Doc. 148, p. 1, at ¶ 3.
[52] Doc. 151, p. 35-37; Transcript 221:5-19, 293:8-294:18.
[53] Doc. 147, p. 14.
[54] Transcript 329:24-330:8.

     a.     Benjamin Barlow was authorized to sign IRS Form W-9 on behalf of Paragon in 2012.[55] He continued to work for Par 2 and was identified as a main point of contact for Par 2, along with Jake Barlow, to Arizona Division of Occupational Safety and Health ("ADOSH") inspector Jeff Wilson ("Inspector Wilson").[56]

     b.     Benjamin Barlow also identified himself to ADOSH as Par 2's safety manager and signed a settlement agreement with ADOSH on behalf of Par 2.[57]

James Jessop:

     a.     James ("Jim") Jessop is Brian Jessop's brother.[58]

     b.     He is the Vice President of Paragon.[59]

     c.     He is a party to the 2007 Permanent Injunction.[60]

     d.     James Jessop was also designated as, and held himself out to be, a management official for Par 2 to ADOSH Inspector Wilson during his inspection.[61]

Kimball Barlow:

     a.     Kimball Barlow was employed by Paragon and his name appears on the cover page of Paragon's 2014 Occupational Safety and Health Policy; and he continued to be employed as a foreman for Par 2.[62]

     19.     Par 2 has between 20 to 30 employees.[63] In August 2017, Don Jessop told Wage

---

[55] Transcript 224:5-12; Doc. 148, p. 31.
[56] Doc. 151, p. 38.
[57] Transcript 80:21-22; Doc. 151, p. 1, ¶ 4; Doc. 151, p. 6-7.
[58] Transcript 219:3-4.
[59] Transcript 219:5-6.
[60] Doc. 26.
[61] Transcript 79:20-25, 100:13-101:11; Doc. 151, p. 38.
[62] Transcript 76:8-12; Doc. 151, p. 21.
[63] Doc. 20, p. 2; Doc. 167, p. 2, ¶ 9.

Hour that he has hired only two or three former Paragon employees to work at Par 2.[64] However, a comparison of employee lists provided by Paragon and Par 2 reflect that at least nineteen employees overlap between the companies.[65] These employees include: William Barlow, Williamson Dutson, Kimball Barlow, Randall Barlow, Leonard Barlow, Tobias Dutson, Leroy Barlow, Jr., Winston Barlow, Winston Zitting, Aaron Barlow, Philip Barlow, Jared Dutson, Derek Jessop, Thomas Jessop, Tennyson Barlow, Keith Dutson, Benjamin Barlow, Jake Barlow, and Don Jessop.[66] In addition, although Brian Jessop and James Jessop deny being employed by Par 2, there evidence to the contrary.[67]

20.    Paragon's Occupational Safety and Health Policy also transferred to Par 2.[68] Par 2 produced it to ADOSH Inspector Wilson as its own policy during an inspection in August 2015.[69]

21.    Similarly, Par 2 produced to Inspector Wilson several OSHA forms bearing Paragon's name as records of compliance with OSHA regulations.[70] Inspector Wilson accepted the records bearing Paragon's name as records belonging to Par 2 when he discovered Paragon

---

[64] Ex. 20, p. 4. And he could only remember the names of two individuals, Philip Barlow and Winston Zitting. Doc. 153, p. 3, ¶ 9.

[65] Transcript 264:22-265:1; *Cf.* Exhs. 13 & 18.

[66] Transcript 363:2-365:10.

[67] *See* ¶ 18, *supra.*

[68] Transcript 94:17-20, 95:23-96:2.

[69] Doc. 151, p. 2, ¶ 2, 7; Transcript 95:23-96:2.

[70] Doc. 151, p. 2, ¶ 6. In response to Inspector Wilson's request for safety records, Par 2 produced OSHA 300A Summary of Work-Related Injuries and Illnesses forms for 2012, 2013, and 2014 and OSHA 300 Log of Work-Related Injuries and Illnesses for 2012, 2013, 2014, and 2015.  (Doc. 151, p. 2, ¶ 6; p. 35-37, 39-42). The OSHA 300A and 300 forms for each of the years identify "Paragon Contractors Corp" or "Paragon Contractors Corporation" as the establishment name. *Id*. The OSHA 300A logs were signed by Jake Barlow, the same individual Inspector Wilson met with on behalf of Par 2. *Id*. Moreover, the phone number provided on the OSHA 300A forms for all three years is the same phone number Kimball Barlow provided for Par 2 on the Information Sheet. Doc. 151, p. 38.

operated as Par 2.[71]

22.     During a subsequent inspection in November 2016, Par 2 again produced records bearing Paragon Contractors' name to ADOSH Inspector Brooks Rogers.[72]

23.     Paragon and Par 2 use the same proposal forms to solicit work from contractors and Brian Jessop signed the proposals for both companies.[73] Paragon and Par 2 produced employee lists on nearly identical forms as well.[74] In an effort to explain this, Don Jessop testified that he is not sure whether Par 2 inherited the same software used by Paragon or purchased something different, despite the fact that he makes all decisions on behalf of Par 2.[75]

24.     Par 2's Office Manager, Jake Barlow, uses Paragon's signature line on emails sent from his Par 2 email account.[76]

25.     Par 2 received some tools, equipment, and vehicles from Paragon; but neither Don nor Brian Jessop would elaborate with respect to what tools, equipment, or vehicles were transferred from Paragon to Par 2. For example, Don Jessop declared that "Par 2 Contractors did not receive *all* of its tools, equipment, or vehicles from Paragon."[77] Brian Jessop declared "neither Don Jessop nor Par 2 purchased any equipment or tools from me or Paragon."[78] At the hearing, Brian Jessop testified that some of Paragon's equipment and tools "could have" ended up in the hands of Par 2, but he could not think of anything specifically; despite having sold all of Paragon's tools and equipment himself.[79] He also is "not real sure" if Paragon is lending any

---

[71] Transcript 101:23-103:1.
[72] Doc. 147, p. 1-2, ¶¶ 2, 4-5.
[73] *Cf.* Doc. 148, p. 19 and 28 *with* Doc. 148, p. 40, 49, 57, 65, & 73.
[74] *Cf.* Exhs. 13 and 18.
[75] Tr. at 362:10-13.
[76] Doc. 148, p. 32.
[77] Doc. 167, p. 3, ¶ 12.
[78] Doc. 158, p. 2, ¶ 9.
[79] Transcript 257:23-258:8.

equipment or tools to anyone at Par 2, but he thinks "there's a good chance" that when Paragon's employees went to work for Par 2 they took tools with them.[80] Similarly, Don Jessop vaguely testified that Par 2 has borrowed "a couple of pieces of equipment" from Paragon but he could not provide any detail regarding any arrangements between the companies.[81] The only example he provided was a telescopic forklift Par 2 borrowed and the only information he could provide with respect to the underlying arrangement between the companies was that "we went to where it was and moved it so that we could use it."[82]

26.   At least one contractor (Porter Brothers) that did business with Paragon for several years believed that Paragon changed its name to Par 2 in 2015.[83] Porter Brothers emailed Brian Jessop on May 1, 2015, asking for a new W-9 because Paragon's company name changed.[84] Jake Barlow responded the same day, copying Brian Jessop, with a W-9 for Par 2 attached.[85] Jake Barlow's signature line included Paragon's company name and phone number.[86] Porter Brothers also continued to refer to the company as Paragon on job sites even after the name change to Par 2.[87] Other contractors continued to use email addresses associated with Paragon (pcctrades@gmail.com) for Par 2 business.[88]

27.   Similarly, some of Par 2's employees continued to identify their employer as Paragon even after the name change occurred.[89]

*Par 2 had notice of the 2007 Permanent Injunction*

---

[80] Transcript 258:22-25; 260:10-18, 261:22-24.
[81] Transcript 355:10-358:10.
[82] Transcript 355:6-356:15.
[83] Doc. 148, p. 1, ¶ 3; Doc. 148, p. 32.
[84] *Id.*
[85] *Id.*
[86] Doc. 148, p. 32.
[87] Transcript 78:18-20.
[88] Doc. 167-3, p. 1; *cf.* Doc. 148, p. 29; Transcript 221:20-22, 297:9-17.
[89] Transcript 103:4-24; Doc. 151, p. 1, ¶ 5.

28.    At least five Par 2 employees and members of management have notice of the 2007 Permanent Injunction.

29.    Brian Jessop and Jim Jessop are individually named on and had actual notice of the 2007 Permanent Injunction.[90] As explained above, Brian Jessop and James Jessop continued to work for Par 2 when Paragon ceased business operations.[91]

30.    Before he went to work for Par 2, Jake Barlow assisted Paragon with gathering and producing documents pursuant to the Department of Labor's subpoena issued to Paragon in 2013 in the course of Wage Hour's child labor investigation surrounding the pecan harvest.[92] Underlying that subpoena and investigation was the 2007 Permanent Injunction against Defendants.[93] Jake Barlow understood the purpose of the subpoena and Wage Hour's investigation.[94]

31.    Don Jessop was a Director for Paragon Contractors Corporation between 2000 and 2010, during which time the 2007 Permanent Injunction was entered.[95]

32.    Keith Dutson is a former employee of Paragon and current employee for Par 2.[96] Brian Jessop testified that he never informed Keith Dutson of the 2007 Permanent Injunction; however, Keith Dutson was involved in subpoena enforcement proceedings with respect to Wage Hour's child labor investigation that culminated in the finding of Paragon and Brian Jessop's

---

[90] Doc. 26.
[91] *See* ¶ 18, *supra.*
[92] Transcript 221:23-223:12. This child labor investigation ultimately culminated in a finding of contempt against Defendants and the entry of Judge Campbell's Order on Sanctions Order on December 6, 2016.
[93] Transcript 223:9-12.
[94] Transcript 223:1-8.
[95] Transcript 265:23-22, 267:3-6; Exhs. 14-15.
[96] Transcript 267:15-17.

contempt of the injunction and was therefore aware of the injunction at least as of that time.[97]

### *Par 2 is able to provide relief*

33.     Par 2's annual dollar volume of business exceeded $8 million in 2016.[98] Par 2 operates in several states and works with a variety of contractors.[99] There is no evidence to support a finding that Par 2 is unable to provide relief in this case.

### Par 2 violated the 2007 injunction

34.     Wage Hour Investigator Jacob Goehl ("WHI Goehl") investigated Par 2 for compliance with the Fair Labor Standards Act in 2016.[100] The investigation occurred at the same location where ADOSH did an investigation at the Marriot Residence Inn in Flagstaff, Arizona.[101] Par 2 was the subcontractor at this job site for Porter Brothers and pursuant to the subcontract agreement Brian Jessop was the primary point of contact for this job.[102] Brian Jessop not only prepared the bid for this job, but he maintained communication with Porter Brothers with respect to this job.[103]

35.     WHI Goehl found Par 2's foreman, Phil Barlow, to be "cagey" throughout the investigation.[104] WHI Goehl held an initial conference and conducted nearly eight hours of surveillance of the job site, where he observed Par 2's employees engaging in rough framing activities and utilizing power nail guns on or about the roof.[105]

---

[97] Transcript 267:18-268:9; *See Harris v. Dutson,* Case No. 2:13-cv-282-TC, Docs. 2-7, which was consolidated into *Harris v. Paragon et al*, Case No. 2:13-cv-281-RJS.
[98] *See* ¶ 15, *supra.*
[99] Doc. 167, p. 2-3, ¶¶ 9, 11.
[100] Doc. 150, p. 1, ¶ 1-2.
[101] The address of the site was 100 N. Humphreys Street, Flagstaff, AZ. *Cf.* Doc. 150, p. 1, ¶ 2 *with* Doc. 147, p. 3 and Doc. 148, p. 66.
[102] Doc. 148, p. 66; Doc. 150, p. 1, ¶¶ 2, 8.
[103] Transcript 255:22-256:2.
[104] Doc. 150, p. 1, ¶ 3.
[105] Transcript at 132:20-133:12, 135:16-25; Doc. 150, p. 1, ¶ 3-4.

36.     Based on records produced by Par 2, WHI Goehl discovered that two of the framers working on the site were 17 years old.[106] He confirmed with Jake Barlow and Par 2's attorney that all of the framers, including the 17-year olds, used power nail guns and worked on the roof.[107] Jake Barlow and Par 2's attorney did not provide any information that was contrary to WHI Goehl's findings or disagree with his conclusions.[108]

37.     WHI Goehl determined that Par 2's employment of these minors violated the child labor provisions of Fair Labor Standards Act of 1938 (29 U.S.C. § 212), and related regulations, including Hazardous Order 5 (29 C.F.R. § 570.55, occupations involved in the operation of power-driven wood-working machines) and Hazardous Order 16 (29 C.F.R. § 570.67, occupations in roofing operations and on or about a roof).[109] These regulations prohibit the employment of minors under the age of 18 from working in such occupations.[110]

38.     During the closing conference, Par 2's attorney told WHI Goehl that Par 2, being from an extremely rural area in Hildale, UT, likely became accustomed to allowing 17-year olds to perform these types of tasks and was unaware that any rules existed to indicate that it was illegal.[111]

39.     Wage Hour assessed a civil money penalty in the amount of $6,920.00; Par 2 accepted the violations, paid the penalty, and the case was administratively closed.[112] Because Par 2 paid the penalty and did not contest the violations, Wage Hour's administrative

---

[106] Doc. 150, p. 1, ¶ 5.
[107] *Id.*; Transcript 130:2-9.
[108] Transcript 133:13-134:11.
[109] Doc. 150, p. 2, ¶ 6.
[110] *Id.*
[111] Doc. 150, p. 2, ¶ 7; Transcript 136:12-21.
[112] Doc. 150, p. 2, ¶ 8.

determination became a final order and not subject to administrative or judicial review.[113]

**Defendants' witnesses are not credible**

Brian Jessop

40.    U.S. District Court Magistrate Judge Furse, U.S. District Court Judge Shelby, and

U.S. District Court Judge Campbell have all determined that Brian Jessop is not credible. In the

Findings of Fact and Conclusions of Law following the first contempt proceeding against

Defendants in this action, Judge Campbell "found Brian Jessop not credible."[114] She noted:

> This court is not the first judge in this case to find Brian Jessop not to be a
> credible witness. During proceedings brought by the Secretary to enforce
> subpoenas issued to Paragon and Brian Jessop, Magistrate Judge Evelyn Furse
> wrote: "Mr. Jessop's claimed lack of knowledge [was] disingenuous." *Harris v.
> Paragon Contractors Corp.*, No. 2:13-cv-00281, slip op. at 2 (D. Utah June 20,
> 2013) (decision and recommendation to enforce subpoenas). Judge Furse found
> "Brian Jessop's claim not to know a single person who harvested ground nuts at
> SUPR lack[ed] believability." *Id.* at 3. She also found that Mr. Jessop's denial of
> knowing who the FLDS Bishop was for two months made it clear that "Mr.
> Jessop simply did not want to provide that information." *Id.* When reviewing
> Judge Furse's conclusions for correctness, U.S. District Court Judge Robert
> Shelby made "the same findings." *Harris v. Paragon Contractors Corp.*, No.
> 2:13-cv-00281, slip op. at 3 (D. Utah Aug. 21, 2013) (order adopting Judge
> Furse's decision and recommendation to enforce subpoenas). Judge Shelby said,
> "It is simply not credible that Mr. Jessop is unable to name a single person who
> harvested the ground nuts when the harvest resulted in Mr. Jessop and Paragon's
> financial gain." *Id.*

41.    Brian Jessop continued to lack credibility in this case with respect to the Order

Appointing Special Master.

a.    After denying Defendants' motion for reconsideration and motion to stay,

the Court entered an Order Appointing Special Master on April 12, 2017.[115] (Defendants also

---

[113] Doc. 150, p. 4; 29 C.F.R. Part 580.5.
[114] Doc. 99, p. 8.
[115] Doc. 137.

filed a motion to stay pending appeal with the Tenth Circuit, which was denied.[116]) Though the Order Appointing Special Master was ultimately reversed (and the parties stipulated that the legal significance of the Tenth Circuit decision is to limit the issues in dispute in this case[117]), it was a valid court order for nearly one year between April 12, 2017, and March 13, 2018, the date of the Tenth Circuit opinion.

b.      Paragon and Brian Jessop's failure to comply with the Order Appointing Special Master between its entry and the Tenth Circuit's reversal demonstrates their ongoing disregard for orders from this Court and their willingness to deceive the Government.[118] The special master order imposed various reporting requirements on Defendants, and any successors in interest, including notifying the Special Master and Wage Hour regarding the location of work sites where Defendants perform work and the identity and dates of birth of all of workers on such work sites.[119] Brian Jessop was also required to disclose the location of every work site where he was working in any capacity.[120]

c.      Brian Jessop did not comply with this order while it was in effect.[121] The only report Wage Hour received from Paragon and Brian Jessop after the entry of the Order Appointing Special Master is an email dated May 2, 2017, wherein Brian Jessop stated that they were not working on any jobsites and had no employees or upcoming contracts.[122] Brian Jessop

---

[116] Appellate Case No. 17-4025, Doc. 01019789481.
[117] Doc. 187.
[118] This is consistent with Judge Campbell's finding in her Sanctions Order: "at the hearing, as well as throughout discovery, it became clear that Paragon and Brian Jessop were not trustworthy and would go to great lengths to deceive the court and the Government." Doc. 109, p. 4.
[119] Doc. 137.
[120] *Id.*
[121] Doc. 149, p. 1, ¶ 3; Doc. 153, p. 5, ¶ 50;
[122] Doc. 153, p. 5, ¶ 13.

also stated he was pursuing another job and would let Wage Hour know if he got hired.[123]

       d.      Wage Hour learned from the Special Master that Brian Jessop allegedly began working for Desert Storm Transportation over the 2017 summer.[124] Wage Hour sent investigators to the company to inquire further.[125] The woman who opened the door confirmed that Desert Storm operates within the building.[126] She stated that she had never seen Brian Jessop on the premises – and she was visibly puzzled by the suggestion that there was any connection between Mr. Jessop and the company.[127] Wage Hour investigators then traveled to Desert Storm's shop location. *Id*. When they arrived, a woman was waiting for them with the phone number for Rich Barlow, the owner of Desert Storm.[128] The investigators spoke with Rich Barlow who provided an employee list with duties.[129] Mr. Jessop's name appeared on the list and his job duties were listed as cleaning trailers in the yard. *Id*.

       e.      According to Brian Jessop, he became employed by Desert Storm Transportation in July 2017.[130] After great difficulty explaining what he does for the company, Brian Jessop finally testified that he mostly works around the shop, cleaning up and doing yard maintenance, and "more recently" he has been helping transport boxes to various companies.[131] This is contrary to what he reported to the special master in June 2017, when he claimed his

---

[123] *Id*.
[124] Doc. 153, p. 5-6, ¶ 14.
[125] *Id*.
[126] *Id*.
[127] *Id*.
[128] *Id*.
[129] *Id*.
[130] Transcript 234:10-11.
[131] Transcript 270:2-271:23.

"duties will be to deliver and pickup loads."[132]

    f. Brian Jessop did not report any of the work he did for Par 2 to Wage Hour or the Special Master, even though he continued to work as an estimator, safety coordinator, and supervisor for Par 2 and was heavily involved in day to day operations of the company.[133] He continued to visit Par 2's job sites as recently as the early months of 2018 (though he claims he was there "mostly just to say hi to the guys").[134]

    g. Brian Jessop visited another Par 2 construction site in Rexburg, Idaho, where Par 2 was working on a student housing project.[135] While there, he tried to solicit a bid for a cleaning job from Headwaters Construction on behalf of his daughter's cleaning company, which he has done on several occasions.[136] This work also was not reported to Wage Hour or the special master.[137]

    42. Brian Jessop's emails from his Par 2 email account also undermine his credibility:

    a. According to Brian Jessop he "helped" Par 2 since the company was formed.[138] In addition to what is set forth above, Brian Jessop's assistance included communicating with estimators and contractors and reviewing contracts to ensure they are consistent with the estimate.[139] Brian Jessop estimated that he spent approximately two to three hours a night each week on these tasks, or maybe 20 hours a month (and sometimes more),

---

[132] Doc. 149, p. 4; Transcript 271:24-272:8. It is also contrary to the information Don Jessop gave to Wage Hour – i.e. that Brian Jessop was working as a dispatcher for a trucking company. Ex. 20, p. 4

[133] *See* ¶ 18, *supra*; Doc. 153, p. 5, ¶ 13; Doc. 149, p. 1, ¶ 3.

[134] Transcript 227:4-15.

[135] Transcript 228:16-23.

[136] Transcript 229:23-230:15, 230:25-231:25.

[137] Doc. 153, p. 5, ¶ 13; Doc. 149, p. 1, ¶ 3.

[138] Transcript 234:12-235:4

[139] Transcript 235:5-15.

between 2014 to the present.[140] Brian Jessop characterizes his involvement with Par 2's for-profit corporation between 2014 to the present as volunteer work.[141]

      b.    To do this work, Don Jessop authorized Brian Jessop to open an email account (par2brian@speedmail.us) to communicate with contractors on behalf of Par 2.[142] The Department of Labor issued a subpoena to Brian Jessop on September 8, 2017, requesting all electronic correspondence sent to or from par2brian@speedmail.us between August 15, 2014 and the present.[143] Brian Jessop produced only 16 emails in response to the subpoena, all of which were junk mail.[144] He produced no emails from his sent, deleted, or any other folders and he claimed that is because he keeps his email "cleaned out" (with the apparent exception of junk mail).[145]

      c.    Wage Hour also issued a subpoena to Par 2 requesting all electronic correspondence sent to or from par2brian@speedmail.us between August 15, 2014 and the present.[146] Though he confirmed that he authorized Brian Jessop to open this email account on behalf of Par 2, Don Jessop refused to produce emails to or from that account in response to the subpoena on the basis that he did not control the server and he was unwilling to ask Brian Jessop to produce them voluntarily.[147]

      d.    Plaintiff obtained numerous emails from an independent source reflecting Brian Jessop's material involvement in Par 2's day to day business operations.[148] Most of the

---

[140] Transcript 235:24-25; 236:25-21.
[141] Transcript 237:22-24, 238:12-15.
[142] Transcript 238:16-25.
[143] Transcript 239:24-240:5; Ex. 5.
[144] Tr. at 241:6-20; Ex. 6.
[145] Transcript 241:21-242:23.
[146] Ex. 19.
[147] Doc. 153, p. 5, ¶ 12.
[148] Exhs. 7-11.

emails were sent during regular business hours, not in the evenings as Brian Jessop claimed, and the content of the emails is not limited to project estimates or contracts.[149] Rather, the content of the emails reflect Brian Jessop's active involvement in Par 2's construction sites – long after Par 2 obtained the contract for work – and they deal with specific items related to the erection of columns, windows that need to be hung, screen walls that need to be framed, anchor bolt problems, and punch list items that need to be done after completion of a project.[150] Brian Jessop conceded that he sent "many" similar emails like the ones in Exhibits 7-11.[151] All of these emails were sent after the entry of the Order Appointing Special Master.[152, 153]

43.    As of the date of the hearing, Brian Jessop had paid $162,000 to the Department of Labor in accordance with Judge Campbell's sanctions order, despite his claim that he had been unemployed up until July 2017.[154] He explained that the money came from family and friends "as though [he] borrowed it from them."[155]

44.    The nature and extent of Brian Jessop's involvement with Par 2 was reinforced by what Wage Hour discovered when it attempted to serve a subpoena to Par 2.[156] After discovering that Par 2 was located in the same business complex as Paragon, the Wage Hour investigator rang the buzzer located outside the building and spoke to a woman who said everyone from Par 2

---

[149] *Id.*; Transcript 243:7-250:16.
[150] *Id.*
[151] Transcript 250:13-16.
[152] Exhs. 7-11.
[153] Plaintiff entered several exhibits containing emails from Brian Jessop's Par 2's email account that were obtained from an independent source. *See* Exhs. 7-11. As part of its investigation of Par 2, Plaintiff issued a subpoena to Benjamin Jessop who is believed to operate the server on which additional emails could be found. Plaintiff is currently litigating a parallel subpoena enforcement action against Benjamin Jessop who has not complied with the subpoena to date. *See Acosta v. Jessop,* 2:17-cv-1301.
[154] Transcript 273:6-15.
[155] Transcript 273:16-22.
[156] Doc. 153, p. 4, ¶ 10.

was out for lunch, but she would try to get a hold of her "boss."[157]  The investigator asked if the person she was trying to get a hold of was Brian Jessop and she said yes and confirmed that Brian Jessop works for Par 2.[158] The woman refused to provide her name or any additional information.[159]

Don Jessop

45.     Though he claims to be 100% owner and responsible for all decisions regarding Par 2, Don Jessop was unfamiliar with several aspects of the company during his August 2017 initial conference with Wage Hour, including: Par 2's annual dollar volume of business; its Employer Identification Number; how business records are kept by the company; when the workweek began; how employees are paid for travel time, overtime, or per diem; whether employees receive sick leave; and whether Par 2 provides lodging for employees.[160] Similarly, although Don Jessop claimed to do the hiring and firing and set rates of pay for Par 2 employees, he was not sure how many salaried employees he had (he could only guess himself, Jake Barlow, and Benjamin Barlow) and he did not know what Jake or Benjamin Barlow's salaries were.[161]

46.     When Wage Hour asked if Par 2 employs any former Paragon employees, Don Jessop stated he hired "two or three employees from Paragon."[162] This is inconsistent with the employee lists produced by Paragon and Par 2 pursuant to subpoenas, which reflect an overlap of approximately 19-21 employees that used to work for Paragon who now work for Par 2.[163]

47.     During the initial conference with Wage Hour in August 2017, Don Jessop

---

[157] *Id.*
[158] *Id.*
[159] *Id.*
[160] Doc. 153, p. ¶ 8; Ex. 20.
[161] *Id.;* Ex. 20.
[162] Ex. 20, p. 4; Doc. 153, p. 3, ¶ 9.
[163] *See* ¶ 19, *supra*; Exhs. 13 & 18.

attempted to minimize the nature and extent of Brian Jessop's involvement with Par 2.[164] He claimed that Brian Jessop sometimes provides assistance in the evenings by ensuring bids are in the appropriate range.[165] He described bidding and estimating as a "hobby" for Brian to explain why Brian is happy to do this work for free as a favor for his brother.[166] Towards the end of the initial conference, Don stated that Brian had been involved more than usual recently, as Par 2 had been really busy and he had to lean on him more as a result; and he confirmed that Brian handles most of the bids/proposals for Par 2 and communicates regularly with contractors on behalf of Par 2.[167] Despite these facts, Don Jessop denies that Brian Jessop has ever been employed by or received wages from Par 2.[168]

48.     A side-by-side comparison of the records produced by Porter Brothers[169] and those produced by Par 2[170] demonstrates that Par 2 removed Brian Jessop's name from the contract documents in several locations. In the contracts produced by Porter Brothers, "Respectfully, Brian Jessop" appears at the bottom of each work proposal.[171] In the identical contracts produced by Par 2 to Wage Hour pursuant to a subpoena, "Respectfully, Brian Jessop" has been erased from the document.[172] Similarly, in at least one location the contract price is crossed out and re-written with a box that says "per phone call with Brian Jessop 5/21/15."[173] In the identical proposal produced by Par 2, the text box has been altered to read "per phone call

---

[164] Doc. 153, p. 4, ¶ 12; Ex. 20.
[165] *Id.*
[166] *Id.*
[167] *Id.*
[168] Doc. 167, p. 4, ¶ 17.
[169] Doc. 148, p. 33-73.
[170] Doc. 153, p. 46-88.
[171] Doc. 148, p. 57, 65 and 73.
[172] Doc. 153, p. 71, 79, and 88.
[173] Doc. 148, p. 65.

5/21/15" and "with Brian Jessop" has been deleted.[174] Par 2 also removed Brian Jessop's name from the subcontract itself before producing it to Wage Hour.[175] The only explanation Don Jessop could provide for producing altered documents to Wage Hour pursuant to a federal subpoena is that the alterations were made as part of Par 2's "filing process."[176]

Jake Barlow

49.    Par 2 provided numerous OSHA forms bearing Paragon's name to ADOSH, on two separate occasions over a year apart.[177] Jake Barlow claims that Benjamin Barlow accidentally sent the Paragon OSHA forms to Inspector Wilson in September 2015;[178] and that he accidentally sent the Paragon OSHA forms to Inspector Brooks in November 2016.[179] His explanation for both "mistakes" is that he kept these forms from his employment at Paragon and he intended to use them as templates for Par 2.[180] This explanation lacks credibility.  Especially considering that Don Jessop reviewed all of the documents sent to ADOSH before production was made.[181] The earliest OSHA form for Par 2 was signed in 2016.[182]  Moreover, Jake Barlow conceded that the OSHA forms are fillable, writable PDF documents found directly on OSHA's website where the "template" is pre-populated.[183]

50.    Jake Barlow signed the OSHA forms for Paragon and Par 2 as "Office Manager"

---

[174] Doc. 153, p. 79.
[175] *Cf.* Doc. 148, p. 66 *with* Doc. 153, p. 80. Brian Jessop's name appears on two additional proposals produced by Porter Brothers that Par 2 did not produce pursuant to the subpoena. *See* Doc. 148, p. 40 & 49.
[176] Transcript 371:2-381:21.
[177] Doc. 151, p. 2, ¶ 6; Doc. 147, p. 1-2, ¶ 4.
[178] Doc. 164, p. 5, ¶¶ 14-15.
[179] Doc. 164, p. 2-3, ¶¶ 6-7.
[180] Doc. 164, p. 2-3, 5, ¶¶ 6-7, 14-15.
[181] Transcript 354:25-355:2.
[182] Transcript 324:15-25.
[183] Transcript 295:11-296:9.

or "Manager."[184] But he claims signing as a manager for Paragon for years 2012 and 2013 was also an "accident."[185]

51.     Jake Barlow also claims that Par 2 mistakenly produced Paragon's safety and health policy to ADOSH.[186] According to him, he intended to use Paragon's policy, but replace Paragon's name with Par 2 within the document.[187]

52.     Jake Barlow made another "mistake" when he emailed Porter Brothers on May 1, 2015, from his Par 2 email account with "Paragon Contractors" in his signature line.[188] He explained that he copied Brian Jessop on this email "so that he knew that I had clarified for Carli Porter that Par 2 Contractors was providing the services on the Sedona Marriott project, not Paragon."[189] But he made no such "clarification" in the email and this explanation does not address the fact that his signature line from his Par 2 email address bears Paragon's name.[190] In response to an email from Porter Brothers stating "I noticed that you (sic) company name changed in the attachment. Can you please send over a new W-9 form?", Jake Barlow simply responded "Carli see attached" and provided Par 2's W-9 as requested.[191]

53.     Jake Barlow denies having any knowledge of Brian Jessop's involvement with Par 2, despite the fact that Brian Jessop is his uncle, and despite the nature and extent of Brian

---

[184] Doc. 151, p. 35 (signed as "Office Manager" for Paragon on May 5, 2013), p. 36 (signed as "Office Manager" for Paragon on January 30, 2014), p. 37 (signed as "Manager" for Paragon on January 31, 2015), and Doc. 147, p. 14 (signed as "Manager" for Par 2 on January 31, 2016).
[185] Transcript 322:10-18.
[186] Doc. 164, p. 6, ¶ 16.
[187] *Id.*
[188] Doc. 148, p. 32; Transcript 320:8-14 ("That was just an e-mail signature mistake. That should have been Par 2 Contractors.")
[189] Doc. 164, p. 4, ¶ 10.
[190] Doc. 148, p. 32; Transcript 300:12-301:9, 320:8-14.
[191] Doc. 148, p. 32; Transcript 301:9-21.

Jessop's involvement at Par 2 by his own admission and other evidence in this case.[192]

## CONCLUSIONS OF LAW

**A.   Par 2, as a successor to Paragon, qualifies as a "person[] in active concert or participation with them" capable of violation of the injunction.**

The Supreme Court in *Regal Knitwear Co. v. NLRB* found that those denominated "successors and assigns" could be held liable for damages flowing from failure to abide by an injunction.[193] "Successors and assigns may. . .be instrumentalities through which defendant seeks to evade an order or may come within the description of persons in active concert or participation with them in the violation of an injunction. If they are, by that fact they are brought within [the] scope of contempt proceedings by the rules of civil procedure [Rule 65(d)]."[194] Likewise, the Supreme Court has held that injunctions to prevent violations of the Fair Labor Standards Act, 29 U.S.C.A. § 201 *et seq.* (1985), may be enforced by contempt proceedings "against the corporation, its agents and officers and those individuals associated with it in the conduct of its business, [and] *it may also, in appropriate circumstances, be enforced against those to whom the business may have been transferred, whether as a means of evading the judgment or for other reasons.*"[195]

The *Walling* decision was made in the context of facts strikingly similar to those here:

> Whether a family business, such as this one appears to be, has successfully avoided all responsibility for compliance with the judgment entered against the

---

[192] Doc. 164, p. 6, ¶¶ 18-20; Transcript 302:10-303:25, 305:2-3; *See* ¶¶ 18, 26, 42, & 44 *supra*.

[193] 324 U.S. 9 (1945).

[194] *Id.*, 324 U.S. at 14.

[195] *Walling v. Reuter Co.,* 321 U.S. 671, 674 (1944) (emphasis added). In *Walling*, the Supreme Court determined that the dissolution of a corporate defendant did not render moot the appellate review of an injunction restraining the corporate defendant and those associated or identified with it from violating the FLSA. The Court reasoned, that "[t]he vitality of the judgment in such a case survives the dissolution of the corporate defendant." *Id*. And that "these principles may be applied in fuller measure in furtherance of the public interest, which here the [Secretary of Labor] represents, than if only private interests were involved." *Id*. at 674-75.

family corporation, by the simple expedient of dissolving it and continuing the business under the individual control of members of the family, as appears to have taken place here, is a question which it is unnecessary for us to decide on the basis of the scanty and not entirely enlightening affidavits now submitted to us. It is enough for present purposes, if the appellate procedure, rendered abortive by respondent's dissolution, has not deprived petitioner of the benefits of the judgment rendered in his favor by the District Court, *that he is entitled to initiate proceedings to enforce the judgment against individuals who either disobey its command or participate in the evasion of its terms. In such proceedings the question as to how far the successor to the corporation is bound by the decree may be fully investigated by the District Court, with appropriate appellate review.*[196]

i.    Par 2 is a successor to Paragon and was the instrumentality through which Defendants sought to evade the 2007 injunction.

The Court finds that Par 2 is a successor to Paragon and Paragon's business was transferred to Par 2 to evade the 2007 injunction and the related subpoena enforcement and contempt proceedings that followed in 2013 (and culminated in a finding of contempt and sanctions order). This finding is supported by sufficient evidence in the record that Brian Jessop and Don Jessop went to great lengths to conceal and minimize Don Jessop's level of involvement with Paragon before Par 2 was up and running;[197] and similarly, their attempt to conceal and minimize Brian Jessop and James Jessop's involvement in Par 2 after Paragon transferred its business operations to Par 2.[198] To further their deception, they produced altered documents to a federal agency pursuant to a subpoena to destroy evidence of Brian Jessop's role with Par 2.[199] As the Court characterized it after the hearing, it amounts to "falsification without justification."[200] The deception also includes Brian Jessop's failure and Par 2's refusal to

---

[196] *Walling*, 321 U.S. at 675 (emphasis added).

[197] *See* ¶ 18, *supra.*

[198] *See* ¶¶ 22, 26, & 47*, supra.*

[199] *See* ¶ 48, *supra.*

[200] Transcript 409:4-13.

produce emails sent to or from Brian Jessop's Par 2 email account pursuant to a subpoena.[201] The emails obtained by the Plaintiff through an independent source unequivocally implicate Brian Jessop as an employee and agent of Par 2 and demonstrate his extensive involvement in Par 2's day to day business operations.[202] The only reason for Par 2 to alter these documents and withhold Brian Jessop's emails is to evade orders from this Court that bind Brian Jessop (and consequently impact Par 2).

The deception is also apparent from Defendants' failure to comply with the Order Appointing Special Master in this action.[203] Though it was ultimately reversed by the Tenth Circuit, it was a valid Order of this Court between April 12, 2017, and March 13, 2018. During this time, there is no question that Brian Jessop was employed by and heavily involved with the operations at Par 2 as evidenced by several emails pertaining to various job sites with Headwaters Construction. Brian Jessop did not notify Wage Hour or the special master of his employment at Par 2. Instead, he claimed to be unemployed until July 2017, at which time he reported only to the Special Master that he was employed by Desert Storm Transportation. The inconsistencies regarding Brian Jessop's alleged employment at Desert Storm are significant and cause the Court to doubt whether Brian Jessop was ever employed by this company.[204] The Court finds that Defendants' failure to comply with the Order Appointing Special Master until it was reversed by the Tenth Circuit demonstrates their ongoing flagrant disregard for orders from this Court.

More broadly, the Court finds that Don Jessop's and Brian Jessop's testimony was reluctant and replete with pauses, vague answers, and absence of recall that affects the Court's

---

[201] *See* ¶ 42(c), *supra.*
[202] Exhs. 7-11.
[203] *See* ¶ 41, *supra*
[204] *Id.*

assessment of their credibility.[205] Like the three federal judges who made adverse credibility findings against Brian Jessop in prior proceedings related to this case, the Court explicitly finds that Brian Jessop is not credible. Similarly, the Court finds that Don Jessop is also not credible.

Ultimately, the Court shares the impression of Porter Brothers that Paragon simply changed its name to Par 2 and continued business as usual. Brian Jessop is the owner of Paragon and his brother, James Jessop, served as the Vice President of the company. Par 2 is owned by their brother, Don Jessop, and Brian Jessop and James Jessop have continued working for Par 2. While Paragon is not formally dissolved, it ceased operations around the same time Par 2 began operations and Par 2 continued Paragon's business under the individual control of family members. Under *Walling*, the Court must now consider the extent to which Par 2, as successor to Paragon, was bound by the 2007 Injunction.

ii.   Successor Liability

Successor liability under the FLSA has yet to be specifically addressed by the Tenth Circuit. However, in *Chao v. Concrete Management Resources, LLC*, the district court permitted the plaintiff to amend her complaint, in part, based on a theory of successor liability under the FLSA.[206] The court found that while the Tenth Circuit had not addressed the issue, the only circuit court that had "held, with no difficulty whatsoever, that successorship liability exists under the FLSA."[207] Since then, the Third, Seventh and Eleventh Circuits have addressed the

---

[205] Transcript 409:14-17.
[206] 2009 WL 564381, *3 (D. Kansas 2009).
[207] *Id.* at *3 (citing *Steinbach v. Hubbard*, 51 F.3d 843 (9th Cir. 1995)).

merits of the issue and concluded that application of the federal common law standard of successor liability to claims under the FLSA is the logical extension of existing case law.[208]

The Tenth Circuit has expressly adopted the "*MacMillan* factors" in analyzing the federal common law standard for a successor corporation's liability in the Title VII context.[209] Those factors include whether the successor company had notice of the charge; the ability of the predecessor to provide relief; and whether there has been a substantial continuity in operations, work force, location, management, working conditions and methods of production.[210] The "nature and extent of [successor] liability is subject to no formula, but must be determined upon the facts and circumstances of each case."[211] "The liability of a successor is not automatic, but must be determined on a case by case basis."[212]

Federal courts have developed a similar common-law doctrine of successorship liability in the labor and employment context which includes some or all of the "*MacMillan* factors."[213] This common law doctrine extends to legal obligations arising under the National Labor Relations Act ("NLRA"), the Fair Labor Standards Act ("FLSA"), Title VII of the Civil Rights Act of 1964 ("Title VII"), and the Family and Medical Leave Act ("FMLA"), among others.[214]

In *Resilient Floor Covering*, the court found that:

---

[208] *See Thompson v. Real Estate Morg. Network,* 748 F.3d 142, 151 (3rd Cir. 2014); *Teed v. Thomas & Betts Power Solutions, LLC*, 711 F. 3d 763, 767 (7th Cir. 2013); *Hatfield v. A+ Nursetemps, Inc.,* 651 Fed.Appx. 901 (11th Cir. 2016).

[209] *Trujillo v. Longhorn Manufacturing Co.*, 694 F.2d 221, 225 n. 3 (10th Cir. 1982).

[210] *Id*. (citing *EEOC v. MacMillan Bloedel Containers, Inc*., 503 F.2d 1086 at 1094 (6th Cir. 1974)).

[211] *Scott v. Sopris Imports Ltd*., 962 F.Supp. 1356, 1359 (D. Colo. May 7, 1997) (citing *MacMillan*, 503 F.3d at 1091).

[212] *Id*.

[213] *See Resilient Floor Covering Pension Trust Fund Bd. of Trustees v. Michael's Floor Covering, Inc.*, 801 F.3d 1079 (9th Cir. 2015).

[214] *See, e.g., Fall River Dyeing & Finishing Corp. v. NLRB,* 482 U.S. 27 (1987) (NLRA); *Einhorn v. M.L. Ruberton Constr. Co.,* 632 F.3d 89 (3rd Cir. 2011) (ERISA);

Striking a "balance between the need to effectuate federal labor and employment
... policies and the need ... to facilitate the fluid transfer of corporate assets," the
successorship doctrine, when applicable, holds legally responsible for obligations
arising under federal labor and employment statutes businesses that are substantial
continuations of entities with such obligations. "The inquiry [in these
successorship cases] is [therefore] not merely whether the new employer is a
'successor' in the strict corporate-law sense of the term. The successorship
inquiry in the labor-law context is much broader." *Sullivan,* 623 F.3d at 781. "The
primary question in [labor and employment] successorship cases is whether,
under the totality of the circumstances, there is 'substantial continuity' between
the old and new enterprise." (internal citations omitted)[215]

"Decisions on successorship must balance, *inter alia,* the national policies underlying the

statute at issue and the interests of the affected parties."[216] Because the origins of successor

liability are equitable, fairness is a prime consideration in its application.[217]

---

*Hubbard,* 51 F.3d 843 (9th Cir. 1995) (FLSA); *Bates v. Pac. Maritime Ass'n,* 744 F.2d 705 (9th
Cir. 1984) (Title VII); *Sullivan v. Dollar Tree Stores, Inc.,* 623 F.3d 770, 780–81 (9th Cir.
2010) (recognizing regulations that incorporate common law successorship principles in defining
successors-in-interest for purposes of FMLA liability).

[215] 801 F.3d at 1090.

[216] *Steinbach,*51 F.3d at 846.

[217] *Id*. In *Teed v. Thomas & Betts Power Solutions, LLC*, Judge Posner, writing for the Court of
Appeals for the Seventh Circuit, made a case for the ongoing vitality of the common law
successorship standard and for its application to claims under the FLSA:

> The idea behind having a distinct federal standard applicable to federal labor and
> employment statutes is that these statutes are intended either to foster labor peace,
> as in the National Labor Relations Act, or to protect workers' rights, as in Title
> VII, and that in either type of case the imposition of successor liability will often
> be necessary to achieve the statutory goals because the workers will often be
> unable to head off a corporate sale by their employer aimed at extinguishing the
> employer's liability to them. This logic extends to suits to enforce the Fair Labor
> Standards Act. "The FLSA was passed to protect workers' standards of living
> through the regulation of working conditions. 29 U.S.C. § 202. That fundamental
> purpose is as fully deserving of protection as the labor peace, anti-discrimination,
> and worker security policies underlying the NLRA, Title VII, 42 U.S.C. § 1981,
> ERISA, and MPPAA." *Steinbach v. Hubbard*, 51 F.3d 843, 845 (9th Cir.1995). In
> the absence of successor liability, a violator of the Act could escape liability, or at
> least make relief much more difficult to obtain, by selling its assets without an
> assumption of liabilities by the buyer (for such an assumption would reduce the
> purchase price by imposing a cost on the buyer) and then dissolving. And
> although it can be argued that imposing successor liability in such a case impedes

      iii.    <u>Par 2 as a successor to Paragon can be held liable for contempt of the 2007</u>
<u>Injunction</u>

Turning to the application of this test and taking into account fairness and the policies
and interests at stake, the Court finds that Par 2 is a successor with liability to Paragon. There has
been a substantial continuity in operations, work force, location, management, working
conditions, and methods of production between Paragon and Par 2; Par 2 had notice of the 2007
injunction; and Par 2 has the ability to provide relief.

      a.    *Par 2 had substantial continuity in operations from Paragon*[218]

In sum, Par 2 picked up where Paragon left off with its commercial framing company.
Par 2 began operations when Paragon was slowing down operations. Dennis Porter, one of the
owners of Porter Brothers, explained the impact of the transfer of business operations between
Paragon and Par 2 succinctly: Porter Brothers hired Paragon as a subcontractor for various jobs
between 2013-2015; in May 2015, Porter Brothers received a bid from the same individuals it
worked with at Paragon, but under the company name Par 2 Contractors, LLC; and Porter
Brothers has worked with Par 2 (and not Paragon) ever since. In light of Paragon's name change
to Par 2, Porter Brothers requested a new W-9, which Jake Barlow provided from a Par 2 email
address with Paragon Contractors in his signature line.

Par 2 continued to operate with Paragon's same address, phone number, email addresses
in some instances, and several of the same form documents (i.e. employee list, proposals, etc.).

---

the operation of the market in companies by increasing the cost to the buyer of a
company that may have violated the FLSA, it's not a strong argument. The
successor will have been compensated for bearing the liabilities by paying less for
the assets it's buying; it will have paid less because the net value of the assets will
have been diminished by the associated liabilities.

711 F. 3d 763, 765-67 (7th Cir. 2013). This pronouncement is well reasoned and directly
applicable to the facts in this case.
[218] *See* ¶¶ 9-27, *supra*

At least 19 of Paragon's employees transferred to Par 2 (some of whom continued to identify their employer as Paragon even after the name change occurred). In addition, Paragon's upper level management transferred to Par 2 as well and continued their same roles in the company, including Don Jessop, Brian Jessop, James Jessop, Jake Barlow, and Benjamin Jessop. Par 2 also inherited and utilized Paragon's Occupational Safety and Health Policy, as well as several OSHA forms bearing Paragon's name to establish compliance with OSHA's record keeping requirements. Par 2 inherited some tools, equipment, and vehicles from Paragon. These facts establish a substantial continuity in operations, work force, location, management, working conditions, and methods of production; Paragon and Par 2 are one and the same.

b.      *Par 2 had notice of the 2007 Injunction*[219]

Brian Jessop and James Jessop are individually named and their signatures appear on the 2007 Injunction. The Court finds that both of these individuals had actual knowledge of the Injunction before Paragon changed its name to Par 2. In fact, the name change occurred shortly after Paragon and Brian Jessop were subject to subpoena enforcement litigation that culminated in a finding of contempt against them for violating the Injunction at issue.[220] Because Defendants used Par 2 as an instrumentality to violate the injunction, Brian and James Jessop's actual knowledge of the Injunction is imputed to Par 2.

The Court also finds that sufficient evidence supports a finding that Don Jessop and Jake Barlow also had actual notice of the Injunction. Don Jessop was a Director for Paragon's corporation from 2000-2010, during which time the Injunction was entered. He was also employed by Paragon over the course of ten years, and he facilitated the transfer of Paragon to

---

[219] *See* ¶¶ 28-32, *supra.*
[220] Doc. 30 (Plaintiff's Motion for Order to Show Cause, summarizing the timeline of events related to Wage Hour's investigation and Defendants' contempt), and Case No. 2:13-cv-281 (consolidated subpoena enforcement proceedings).

Par 2 with his brothers who are individually named as parties to the Injunction. Though Don Jessop claims that he "has never seen, been given of, or read" the 2007 Permanent Injunction,[221] the Court does not find this testimony to be credible. Don Jessop's willful ignorance of the Injunction does not negate a finding that he had actual knowledge of it.

Similarly, Jake Barlow was the primary point of contact at Paragon before the name change to Par 2. He testified that he assisted Paragon with gathering and producing documents pursuant to the Department of Labor's subpoena issued to Paragon in 2013 in the course of Wage Hour's child labor investigation. Underlying that subpoena and investigation was the 2007 Injunction and Jake Barlow understood the purpose of the subpoena and Wage Hour's investigation. The Court finds it highly unlikely given his role in the company and his participation in the prior investigation that he had no knowledge of the Injunction.

The Court finds that the credibility issues involving Defendants' witnesses, and the nature and extent of the deception involved in concealing the relationship between Paragon, Brian Jessop, James Jessop, and Par 2 are intertwined with and directly related to Defendants' and Par 2's attempt to evade the 2007 Injunction. As such, the Court finds that all parties involved in this action had actual knowledge of the Injunction.

c.      *Par 2 has the ability to provide relief* [222]

Par 2's annual dollar volume of business exceeded $8 million in 2016. Par 2 operates in several states and works with a variety of contractors. The Court finds that there was no evidence presented at trial to support a finding that Par 2 is unable to provide relief in this case. To the contrary, the Court finds that Par 2 does have the ability to provide relief.

Under the totality of circumstances in this case, the Court finds that there is substantial

---

[221] Doc. 167, p. 6, ¶ 31.
[222] *See* ¶ 33, *supra.*

continuity between Paragon and Par 2 and that the name change of the entity from Paragon to Par 2 is the only real distinction to be made between the two companies. This finding is based on the national policies underlying the Fair Labor Standards Act and the interests of the affected parties with fairness being the prime consideration. Defendants and Par 2 cannot be permitted to avoid all responsibility for compliance with the 2007 Injunction entered against Paragon, Brian Jessop, and James Jessop, by the simple expedient of unofficially transferring Paragon's business operations to Par 2 under the individual control of the same family members.

As the instrumentality through which Defendants sought to evade the 2007 Injunction, Par 2 comes within the description of "persons in active concert or participation with them" in violation of the Injunction. Under this guise, and as a successor to Paragon, the Court finds that at all relevant times Par 2 was bound by the 2007 Injunction in this case.

**B.      Defendants and Par 2 are in Contempt of the 2007 Injunction**

In order to prove contempt of a court order, a plaintiff must establish by clear and convincing evidence, that (1) a valid court order existed, (2) defendants had knowledge of the order, and (3) defendants disobeyed the order.[223]

i.      A valid court order existed

The 2007 Permanent Injunction entered by this Court on November 29, 2007, is a valid court order. The injunction permanently enjoins Paragon, Brian Jessop, James Jessop and "their officers, agents, servants, employees, and those persons in active concert or participation with them" from violating the provisions of Sections 12(c) and 15(a)(4) of the FLSA.

ii.      Defendants had knowledge of the court order.

---

[223] *Reliance Ins. Co. v. Mast. Constr. Co.*, 159 F.3d 1311, 1315 (10th Cir. 1998); see also *F.T.C. v. Kuykendall*, 371 F.3d 745, 756 (10th Cir. 2004).

For the reasons stated above, the Court finds that Defendants and Par 2, as an intervening party, had knowledge of the Injunction.

      iii.    <u>Defendants and Par 2 disobeyed the order</u>[224]

Plaintiff has shown by clear and convincing evidence that Defendants and Par 2 disobeyed the 2007 Injunction by suffering or permitting minors to work in violation of the FLSA, 29 U.S.C. § 212. Par 2 was the instrumentality through which Defendants employed minors as framers on a construction site where they used power nail guns and worked on a roof in violation of Hazardous Order 5 (29 C.F.R. § 570.55, occupations involved in the operation of power-driven wood-working machines) and Hazardous Order 16 (29 C.F.R. § 570.67, occupations in roofing operations and on or about a roof). Brian Jessop prepared the bid for the job where the child labor occurred, he was designated as the primary point of contact for Par 2 on the subcontract for work, and he maintained communication with the general contractor throughout the job.

As a result of the child labor violations, Wage Hour assessed a civil money penalty in the amount of $6,920.00. Par 2 accepted the violations, paid the penalty, and the case was administratively closed. By paying the penalty and not taking exception to the determination that the violations for which the penalty was imposed occurred, the administrative determination became a final order and not subject to administrative or judicial review.[225]

**C.     Conclusion**

Less than two years ago, the Honorable Judge Campbell found Defendants Paragon and Brian Jessop in contempt of the 2007 injunction.[226] The Sanctions Order begins with a finding

---

[224] *See* ¶¶ 34-39, *supra.*
[225] Doc. 150, p. 4; 29 C.F.R. Part 580.5.
[226] Doc. 99.

that "[b]ehind a veil of secrecy in Southern Utah's desert country the Defendants profited from the labor of a religious community's children in violation of the court's previous injunction." Judge Campbell found "[a]t the hearing, as well as throughout discovery, it became clear that Paragon and Brian Jessop were not trustworthy and would go to great lengths to deceive the court and the Government."[227] This finding was based in part on the fact that "shortly after being caught using child labor in the construction industry and agreeing to the entry of the [2007] Injunction, Defendants secretly began profiting from child labor once again. Defendants sought to conceal their knowing and willful violation of the Injunction."[228]

Despite the finding of contempt and the imposition of sanctions on Defendants Paragon and Brian Jessop just two years ago, we again are faced with Defendants' contempt of the Injunction and their extraordinary efforts to conceal their knowing and willful violation of it. Shortly after being caught profiting from the labor of a religious community's children in violation of the 2007 Injunction, Defendants began profiting from child labor in the construction industry once again. The Court agrees with Judge Campbell's finding that Paragon and Brian Jessop are not trustworthy, and the Court finds that they have gone to great lengths, in active concert and participation with Par 2 and Don Jessop and Jake Barlow, to deceive the Court and the Government by simply changing Paragon's name to Par 2 to evade the Court's orders.

The Court finds that Plaintiff has proven by clear and convincing evidence that Par 2 Contractors, LLC, is a successor in interest to Paragon Contractors Corporation. Plaintiff has also proven by clear and convincing evidence that Defendants and Par 2, and Don Jessop and Jake Barlow as agents of Par 2, are in contempt of the 2007 Injunction.

---

[227] Doc. 109, p. 4.
[228] Doc. 109, p. 10.

For the foregoing reasons,

IT IS ORDERED that Par 2 Contractors, LLC, as a successor in interest to Paragon Contractors Corporation, is joined as a Defendant to this action.[229]

IT IS FURTHER ORDERED and ADJUDGED that Defendants Paragon, Brian Jessop, and Par 2, Don Jessop, as Par 2's agent, and Jake Barlow as Par 2's agent, are in civil contempt of this Court's 2007 Injunction (Doc. 26).

In order to purge themselves of such contempt, Defendants, its officers, agents, successors and assigns shall:

1.     Provide a copy of the 2007 Injunction and this Order to every contractor, employer, or entity with whom it has entered into a contract to perform work over the last ten years. Defendants shall certify to Wage Hour that it has complied with this provision and provide a list of every contractor, employer, or entity to whom such notice was provided within 30 days of the entry of this Order.[230]

2.     Provide a copy of the 2007 Injunction and this Order to each of their employees. Defendants shall certify to Wage Hour that it has complied with this provision and provide a list

---

[229] Pursuant to Fed. R. Civ. P. 25(c), "[i]f an interest is transferred, the action may be continued by or against the original party unless the court, on motion, orders the transferee to be substituted in the action or joined with the original party." A "transfer of interest" in a corporate context "occurs when one corporation becomes the successor to another by merger or other acquisition of the interest the original corporate party had in the lawsuit." *Dalzell v. Trailhead Lodge at Wildhorse Meadows, LLC,* 2012 WL 3150565 (D. Colo., Aug. 2, 2012) (citing *Luxliner P.L. Export Co. v. RDI/Luxliner, Inc.*, 13 F.3d 69, 71 (3d Cir.1993)). Substitution of a successor in interest or its joinder as an additional party under Rule 25(c) is within the sound discretion of the trial court. *Prop-Jets, Inc. v. Chandler,* 575 F.2d 1322, 1324 (10th Cir. 1978). Notably, "[t]he most significant feature of Rule 25(c) is that it does not require that anything be done after an interest has been transferred." *Dalzell,* 2012 WL 3150565 at *1. "The action may be continued by or against the original party, and the judgment will be binding on the successor in interest even though the successor is not named." *Id.* (citing *Capitol Packaging Corp. v. Stone Container Corp.*, 2006 WL 6840942, at *2 (D. Colo. June 27, 2006)).
[230] *NLRB v. Monfort, Inc.*, 29 F.3d 525, 529 (10th Cir. 1994).

of every employee to whom such notice was provided within 30 days of this Order.[231]

3.      Defendants shall place $50,000 into a fund to provide training on the child labor provisions of the FLSA and its implementing regulations to all of Defendants' employees and management, including all employees under the age of 18.[232]  This remedy is imposed in order to compensate those who have suffered most from Defendants' contemptuous conduct, namely, Defendants' under-aged employees, by providing a fuller understanding of the child labor provisions of the FLSA to under-aged workers, their adult co-workers, and their managers. In imposing this requirement, the Court credits testimony from WHI Goehl regarding his closing conference with Par 2 following Wage Hour's child labor investigation in 2016. During that conference Par 2's attorney told WHI Goehl that Par 2, being from an extremely rural area in Hildale, UT, likely became accustomed to allowing 17-year olds to perform these types of tasks and was unaware that any rules existed to indicate that it was illegal.[233] This remedy squarely addresses this problem. Moreover, the training fund and associated training activities also serve to compensate the Plaintiff and the public for the harm caused by Defendants' contempt. Congress has deemed that it is in the public interest to eliminate detrimental labor conditions, including, most importantly, the use of illegal child labor. Defendants' continued exploitation of child labor for their own competitive advantage has harmed Plaintiff's ability to uphold that public interest.[234] The parties shall confer regarding the implementation and operation of this training fund and submit a proposed plan to the Court within 30 days of this Order.

---

[231] *Id.*
[232] *EEOC v. Local 638 et al,* 753 F.2d 1172, 1184 (2nd Cir. 1985) (upholding a compensatory contempt remedy fashioned as a training fund intended to compensate those who had suffered most from defendants' contemptuous conduct).
[233] Doc. 150, p. 2, ¶ 7; Transcript 136:12-21.
[234] 29 U.S.C. § 202.

4.      Defendants shall pay to Plaintiff the reasonable costs of prosecuting the contempt, including attorney's fees.[235] Plaintiff shall submit an affidavit and proposed order establishing such costs, including attorney's fees, travel and subsistence costs for Plaintiff's counsel and witnesses, witness fees and mileage allowances, transcript and court reporter costs, etc., within 14 days of the entry of this Order. Defendants shall file any objections to the proposed order within 14 days thereafter. Defendants shall reimburse Plaintiff for the reasonable costs of prosecuting the contempt, including attorney's fees, within 30 days of an Order from the Court imposing such costs.

5.      In the event that Defendants fail to comply with any provisions of this Order, including the deadlines set forth above, a prospective daily monetary penalty in the amount of $1,000 will be imposed until compliance is reached.[236]

DATED this _____ day of _____, 2018.

BY THE COURT:

_____
DAVID NUFFER
United States District Court Judge

---

[235] *John Zink Co. v. Zink,* 241 F.3d 1256, 1261-62 (10th Cir. 2001).
[236] *Monfort, Inc.*, 29 F.3d at 530.

The foregoing Proposed Findings of Fact and Conclusions of Law are respectfully submitted on behalf of Plaintiff this 4th day of May, 2018.

Kate O'Scannlain, Solicitor of Labor
James E. Culp, Regional Solicitor
John Rainwater, Associate Regional Solicitor
Lydia Tzagoloff, Wage and Hour Counsel and Special
     Assistant United States Attorney
Alicia A.W. Truman, Trial Attorney

*/s/ Karen E. Bobela*
_____
Karen E. Bobela, Trial Attorney

United States Department of Labor
Attorneys for Plaintiff

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that I am an employee of the United States Department of Labor,

Office of the Solicitor, and that a copy of the foregoing PLAINTIFF'S PROPOSED FINDINGS

OF FACT AND CONCLUSIONS OF LAW was filed electronically using the Court's CM/ECF

system this 4th day of May, 2018, which is relied on to promptly notify counsel for the

Defendants named below:

Rick J. Sutherland and M. Christopher Moon
JACKSON LEWIS, PLLC
222 S. Main Street, #500
Salt Lake City, UT 84101
(801) 736-3199
ricksutherland@jacksonlewis.com
chris.moon@jacksonlewis.com

Kenneth Okasaki
Jones Waldo Holbrook & McDonough PC
170 S. Main Street, #1500
Salt Lake City, UT 84101
(801) 521-3200
kokazaki@joneswaldo.com

Jeffrey C. Matura
Barrett & Matura, P.C.
8925 East Pima Center Parkway, Suite 100
Scottsdale, Arizona 85258
Direct: 602-792-5721
Fax: 602-792-5710
jmatura@barrettmatura.com

Blake Hamilton
Durham Jones & Pinegar
111 S. Main Street, Suite 2400
Salt Lake City, UT 84111
(801) 415-3000
bhamilton@djplaw.com

*/s/ Karen E. Bobela*

_____